**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-CR-73-BAH** |
| **v.** | : | |
| | : | |
| **NICHOLAS DECARLO and** | : | |
| **NICHOLAS OCHS,** | : | |
| | : | |
| **Defendants.** | : | |

**OPPOSITION TO DEFENDANT DECARLO'S MOTION TO DISMISS COUNTS ONE
AND TWO OF THE INDICTMENT**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits this opposition to defendant Nicholas DeCarlo's Motion to Dismiss Counts One and Two of the Indictment. (Dkt. 55 (hereinafter, "motion" or "Mot.")).  Those counts charge DeCarlo with obstruction of an official proceeding and conspiring to do so, in violation of 18 U.S.C. §§ 371 and 1512(c)(2), arising from defendant's actions on January 6, 2021, when he entered the U.S. Capitol building with a mob of rioters, intending to disrupt Congress's certification of the Electoral College vote (the "certification"). DeCarlo's motion should be denied because the certification—which is required by the Constitution and governed by precise statutorily prescribed requirements—is an "official proceeding" as defined by Section 1512(c)(2).   In addition, Section 1512(c)(2) is not unconstitutionally vague as applied to DeCarlo's conduct, which includes breaching the Capitol as part of the January 6 mob.  Two judges in this district have already denied similar motions brought by January 6 defendants.  This Court should do the same.

**FACTUAL BACKGROUND**

The indictment details the background facts regarding the Capitol riot on January 6, 2021: the commencement of the Joint Session of Congress around 1:00 p.m. in the Capitol to certify the

Electoral College results for the 2020 Presidential Election, the unlawful entry of crowd members into the Capitol without authorization, the suspension of the Joint Session while law enforcement worked to restore order and clear the Capitol of the unlawful occupants, and the resumption of the Joint Session around 8:00 p.m., approximately six hours after the crowd breached the Capitol. Indictment ¶¶ 1-11.

The indictment alleges that DeCarlo conspired to "corruptly obstruct, influence and impede" the certification.  *Id.* ¶ 16.  DeCarlo and his co-defendant Nicholas Ochs, the founding member of the Hawaii Chapter of the Proud Boys, coordinated their travel from other states to Washington, D.C.  *Id.* ¶ 20.  On January 6, they entered the Capitol without authorization, shortly after it had been breached.  *Id.* ¶ 24.  They occupied the Capitol, traveling throughout the building.  *Id.* ¶ 26.  They marked their territory by defacing the Memorial Door with the slogan "Murder the Media."  *Id.* ¶ 27.  They also stole flexible handcuffs belonging to the Capitol Police.  *Id.* ¶ 28.

Defendants, who posted their exploits to social media, *id.* ¶ 26, appear in videos narrating the riot, some of which provide additional details (that are not specifically alleged in the indictment) regarding their actions and state of mind.  Approaching the Capitol Building, Ochs declared that the "steal" was taking place at the Capitol and that he and DeCarlo were going to stop it; DeCarlo agreed.  They joined the crowd amassing at the West Front of the Capitol, in plain view of scaffolding in place for the inauguration.  DeCarlo was singing and smiling.  He asked Ochs if they should try to climb "that thing," pointing his camera toward a tower set up for members of the media, which some other rioters had already climbed.  When DeCarlo asked if they should "try to climb" something to get access to the Capitol Building, Ochs pointed out, "we're not supposed to be here, this is beyond the fence," an admission that both men knew they

were trespassing.  DeCarlo, responded "we're all felons!  Yeah!  Felony charges!  Felony charges!"  He commented, "it's getting aggressive now.  It's getting real."

He was correct.  Munitions audibly exploded; clouds of smoke were visible in the air. Nonetheless, DeCarlo and Ochs proceeded up a flight of stairs toward an entrance to the Capitol building, entering soon after the initial breach of the Senate Wing Door.  Once DeCarlo and Ochs entered the Capitol and made their way to its Crypt, they lit cigarettes.  Ochs said, "sorry we couldn't go live when stormed the fucking Capitol and made Congress flee."

Later that day, after they had left the Capitol, Ochs announced, "we have some good news:  . . .  We have just, uh, peeked through this window, and on the television the headline reads that Congress stopped the vote when we stormed the Capitol.  And, as we've been saying all day, we came here to stop the steal." DeCarlo interjected "we did it," to which Ochs replied, "we were being sarcastic, but we didn't know we were actually going to . . . ."  DeCarlo then asked, "Wait, you were being sarcastic?"  Ochs answered, "I was being a bit facetious," to which DeCarlo replied, "Oh no, that's what I came down here to do. We fucking did it."  Ochs then said, in substance, "It may resume, but the steal is for now stopped.  You're welcome, America!" to which DeCarlo replied "we did our job. We did our job."  In a different video, DeCarlo also boasted of spending "an hour and a half, two hours," in the building and getting "pretty far."  He also volunteered that he saw items get torn from walls, "cops get overwhelmed a shit load," and puddles of blood.

## PROCEDURAL HISTORY

On February 4, 2021, the Grand Jury returned an indictment charging DeCarlo, along with his co-defendant, Ochs, with Conspiracy, in violation of 18 U.S.C. § 371 (Count One); Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1521(c)(2) (Count Two); Destruction of

Government Property, in violation of 18 U.S.C. §§ 1361 and 2 (Count Three); Theft of Government Property, in violation of 18 U.S.C. §§ 641 and 2 (Count Four); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Five); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Six); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4) and (2) (Count Seven).  The conspiracy charge (Count One) alleges a conspiracy to obstruct, influence and impede any official proceeding, (specifically, Congress' certification of the Electoral College vote), or to attempt to do so, in violation of 18 U.S.C. § 1512(c)(2).  Indictment ¶ 16.

On December 10, 2021, DeCarlo filed the instant motion.  ECF No. 55.  Ochs filed a Notice of Adoption of Motion on December 14, 2021.  ECF No. 56.  The allegations in the indictment against both defendants are identical, save two paragraphs identifying each defendant.  *See* Indictment ¶¶ 13-14.

## LEGAL STANDARD

An "indictment's main purpose is to inform the defendant of the nature of the accusation against him." *United States v. Ballestas*, 795 F. 3d 138, 148-49 (D.C. Cir. 2015) (citation omitted). A defendant may move to dismiss an indictment or count for failure to state a claim prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  Because dismissal of an indictment "directly encroaches upon the fundamental role of the grand jury," however, "dismissal is granted only in unusual circumstances." *Ballestas*, 795 F. 3d at 148 (internal quotation marks omitted). "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).

The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.*

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1).

Section 1512(c)(2) of Title 18 of the U.S. Code provides that "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both." The "Definitions" provision, 18 U.S.C. § 1515, states that "[a]s used in section[] 1512 . . . the term 'official proceeding' means":

> (A) a proceeding before a judge or court of the United States … or a Federal grand jury;
> (B) a proceeding before the Congress;
> (C) a proceeding before a Federal Government agency which is authorized by law; or
> (D) a proceeding involving the business of insurance … before any insurance regulatory official or agency….

18 U.S.C. § 1515(a)(1).

## <u>ARGUMENT</u>

DeCarlo's two challenges to the indictment both lack merit. The Joint Session's certification of the Electoral College is an "official proceeding" for purposes of Section 1512(c)(2), and it has statutorily mandated features that satisfy even DeCarlo's inappropriately narrowed definition of that term. In addition, Section 1512(c)(2)'s requirement that a defendant act "corruptly" is not vague as applied to DeCarlo; courts have upheld and construed "corruptly," and

illegally entering and occupying the Capitol as part of a mob to disrupt the certification on January 6, along with DeCarlo's other conduct, qualifies.

The same day DeCarlo filed this motion, a court in this district denied a similar motion to dismiss brought by two January 6 defendants. Mem. Op., *United States v. Sandlin,* No. 21-cr-88 (DLF), ECF No. 63 (D.D.C. Dec. 10, 2021). In *Sandlin,* Judge Friedrich found that the certification was an official proceeding and that Section 1512(c)(2) was not unconstitutionally vague as applied to the defendants. *Id.* at 5-18 (finding that the certification was an official proceeding); 18-26 (rejecting vagueness-as-applied challenge).

On December 20, in *United States v. Caldwell,* Judge Mehta reached the same conclusion. Mem. Op., *United States v. Caldwell,* No. 21-cr-28 (APM), ECF No. 558 (D.D.C. Dec. 20, 2021). Like *Sandlin* (which it found "persuasive," *id.* at 8 n.3), *Caldwell* held that the certification was an official proceeding. *Id.* at 8-16. It also found that Section 1512(c)(2), while "expansive," was not vague. *Id.* at 16-27 (citation omitted). The following day, Judge Boasberg rejected similar arguments in *United States v. Mostofsky,* also finding *Caldwell* and *Sandlin* persuasive. *U.S. v. Mostofsky,* No. 21-cr-138 (JEB), ECF No. 88, at 21 (D.D.C. Dec. 21, 2021). This Court should follow suit and deny DeCarlo's motion.

## I.      The certification of the Electoral College vote is an "official proceeding"

DeCarlo's first argument is that the Joint Session of Congress convened for the Electoral College vote certification is not, as a matter of law, an "official proceeding" under § 1512(c). (Mot. at 6-9). As DeCarlo acknowledges, though, "official proceeding" is defined to include "a proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). Under the plain meaning of "a proceeding before the Congress," a joint session of Congress to certify the electoral vote qualifies.

Rather than grapple with the statute's plain meaning, DeCarlo claims that an "official proceeding" must have some "evidentiary" or "fact-finding, testimonial, or investigative" purpose. (Mot. at 8.)  In an argument that may come as a surprise to hundreds of people (including these defendants) who stormed the Capitol, wanting to change the outcome of the presidential election, DeCarlo further argues that the certification does not qualify as an official proceeding because it was "ministerial or ceremonial," a mere formality, based on statements from then-Vice President Pence and three Senators on January 6.  (Mot. at 9.)

DeCarlo's arguments are flawed.  As Judge Boasberg observed, "it is difficult to fathom that a reasonable person would not believe the Electoral College certification was an official proceeding, especially since the definition of that term includes 'a proceeding before Congress'; indeed, this is precisely the reason why the January 6 rioters wished to stop it."  *Mostofsky, supra,* at 23.  There is no requirement that an official proceeding have a fact-finding, testimonial, or investigative (in other words, an evidentiary or adjudicative) purpose.  Second, even if such a requirement existed, the certification would qualify because members of Congress were there to adjudicate challenges to the electoral college vote.  For this same reason, the certification is not, as a matter of law, a pure formality.  The recent comments of four elected officials, none of whom were addressing the precise question at hand, do not override the text of the Constitution and laws of the United States.

## A. Background

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote.  Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be

counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The obstruction statute with which DeCarlo is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. 18 U.S.C. § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1) (emphasis added).

### B.  The certification of the Electoral College vote is a proceeding before the Congress

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2).  That conclusion flows principally from the obstruction statute's plain text.  *See Caldwell*, *supra,* at 8 ("a straightforward reading of that definition easily reaches the Certification of the Electoral College vote").  DeCarlo quotes the statutory text, but then argues that courts have limited "official proceeding[s]" to matters that involve "some evidentiary function."  (Mot. at 6).  He further asserts that the certification is merely "ministerial or ceremonial" and therefore is not an "official proceeding."  (Mot. at 8).  As Judges Friedrich, Mehta, and Boasberg recently concluded, these arguments are incorrect.  *See Sandlin*, *supra*, at 5-9; *Caldwell, supra,* at 8-16; *Mostofsky, supra,* at 21-23.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding."  *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013).  The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com).  The certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is a proceeding— and indeed an official proceeding—under that broad definition.  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.  Section 1515's text encompasses not

only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."  18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing."  *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").  For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the cases relied upon by DeCarlo—courts analyze the degree of formality involved in an investigation.  *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings

(or something akin to hearings)"); *United States v. Binette*, 828 F. Supp. 2d 402, 404 (D. Mass. 2011) (preliminary SEC investigation); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added).

DeCarlo cites *Ermoian, Ramos, Binette,* and *Dunn*, and even quotes from *Dunn*'s reference to formality, but claims, without explanation, that what these cases actually require is an that a proceeding have an "evidentiary function." (Mot. at 6-8). DeCarlo misinterprets his own citations. For example, *Binette* did not find that the preliminary SEC investigation at issue was not an official proceeding because it did not have an evidentiary function; rather, it was too "casual" and "preliminary." *Binette,* 828 F. Supp. 2d at 404. The same was true of the internal investigation at issue in *Ramos:* it had an evidentiary function; the issue was the level of formality. *Ramos,* 537 F.3d at 463.

DeCarlo is thus wrong to imply that courts have agreed with his narrowed approach. As noted above, the cases cited by DeCarlo addressed an entirely different question, namely, whether law enforcement investigations qualified as "official proceedings" under a subsection defining that term as a "proceeding before a Federal Government agency which is authorized by law." 18 U.S.C. § 1515(a)(1)(C). Those courts have therefore struggled with questions—to what extent an agency investigation is a proceeding; whether the requirement in § 1512(f)(1) that a proceeding "need not be pending or about to be instituted at the time of the offense" as applied to agency investigations would reach "conduct that occurred even pre-criminal-investigation," *Ermoian*, at 752 F.3d at 1172; whether the "official" modifier "implies something more formal than a mere investigation," *Sutherland*, 921 F.3d at 426—that do not arise here. *See Caldwell, supra,* at 13. The certification

of the Electoral College vote is a congressional proceeding, not an investigation, and involves a degree of formality distinct from any agency investigations.  Even by the logic of the cases DeCarlo cites, the Certification of the Electoral College vote exudes 'formality' and involves a 'formal convocation' of Congress" and "bears none of the features" that courts "found wanting with respect to mere investigations." *Caldwell, supra,* at 13 (citing 3 U.S.C. §§ 15–16).  And, in any event, the pertinent definition—a "proceeding before the Congress"—is phrased more broadly than the definition those courts were construing.

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169.  Few events are as solemn and formal as a Joint Session of the Congress.  That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute.  Required by law to begin at 1 p.m. on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*.  The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.  3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.*  And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's

platform"). The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, the certification is a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).[1] It is difficult to imagine a proceeding more "official" than a constitutionally and statutorily prescribed Joint Session of Congress.

DeCarlo later argues that the Joint Session lacked "any fact finding, testimonial, or investigative purpose." (Mot. at 8). These requirements are absent from the text of the statute. To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, a proceeding before the Congress. Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete." *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted). DeCarlo offers no rationale for breezing past the statute's plain text and adding the requirement that the proceeding have some "fact finding, testimonial, or investigative purpose." And while the "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991),

---

[1] And to the extent that "before" refers to "some formal convocation of the agency in which parties are directed to appear," *see United States v. Young*, 916 F.3d 368, 384 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 140 S. Ct. 113 (2019), the certification of the Electoral College vote involves a "formal convocation" of Congress to assess the Electoral College vote and "declare[]" the "result" of the presidential election, 3 U.S.C. § 16. As *Caldwell* found, the certification took place "before the Congress": "Congress jointly convened on January 6 to open, potentially debate, and count the Electoral College votes." *Caldwell, supra,* at 9 (citing U.S. Const. art. II, § I, cl. 3; U.S. Const. amend. XII; 3 U.S.C. §§ 15–18).

even the obstruction statute's legislative history underscores that Congress intended official proceeding to reach "broadly," and to encompass "the rare type of conduct that is the product of the inventive criminal mind." S. Rep. No. 97-532, at 17-18.

Moreover, "[h]ad Congress wished to criminalize under section 1512 only those acts that obstruct its adjudicatory, investigative, or legislative proceedings, it had a ready-made template for how to do so." *Caldwell, supra,* at 10. As *Caldwell* observed, Congress would have needed to look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency. *Id.* Section 1505 also expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). If Congress could limit the obstruction prohibition under Section 1505 to congressional investigations, it could have done so in the text of Section 1515(a)(1)(B). *See Russello v. United States,* 464 U.S. 16, 23 (1983) (refraining from concluding that "differing language in the two subsections has the same meaning in each"). But it did not. Instead, Congress enacted broader language—"a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies] and investigation[s]" envisioned in Section 1505. That broader definition includes the Electoral College vote certification. "The court must presume that Congress understood the prevailing statutory landscape when enacting section 1512(c)." *Caldwell, supra,* at 10 (citing *Garrett v. United States*, 471 U.S. 773, 793–94 (1985)).

DeCarlo's narrowed reading of "proceeding before the Congress" in 18 U.S.C. § 1515(a)(1)(B)—in essence, importing an extra-textual "quasi-judicial" requirement—would undercut the broad statute that Congress enacted. The Court should not "add a requirement to the

statute that Congress did not see fit to include." *Caldwell, supra*, at 10 (also observing that "Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions").[2]  In DeCarlo's view, for example, an individual who threatened a Senator and a Representative with injury unless each agreed to object to the Electoral College certification—even though each Member knew that the objections were frivolous—would not amount to obstruction.  Nor would it appear to cover an individual who paid one of the tellers—who are appointed by the Senate and House of Representatives to handle the Electoral College votes—to falsify or destroy votes.   The certification of the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *Sutherland*, 921 F.3d at 426. Whatever the outer limits of a "proceeding before the Congress" for purposes of the obstruction statute, the Electoral College vote certification falls well within them.

DeCarlo's challenge fails even if he were correct—and he is not—that for a proceeding to constitute an "official proceeding" under the obstruction statute, that proceeding must have an "evidentiary function" or a "fact finding, testimonial, or investigative purpose." (Mot. at 8).  Far from a "ministerial or ceremonial" action (Mot. at 9), the certification of the Electoral College vote comprises features that resemble an adjudicative proceeding. *See Caldwell, supra,* at 15-16 ("Even under Defendants' narrowed reading, [the certification] was an 'adjudicatory' proceeding and therefore an 'official proceeding' for purposes of section 1512(c)(2)").  It involves the convening

---

[2] DeCarlo notes that, in the Joint Session, "Congress did not convene to consider legislation or perform any other of its enumerated powers," (Mot. at 8), but some forms of "consider[ing] legislation," such as a floor debate, would not seem to meet DeCarlo's own requirement that the proceeding serve a "fact finding, testimonial, or investigative purpose."

of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]."  3 U.S.C. § 15.  That body convenes to render judgment on whether to certify the votes cast by Electors in the presidential election.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  *Id.*  And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result."  3 U.S.C. § 16.  Contrary to DeCarlo's argument, therefore, "it is inaccurate to characterize the Certification that occurred on January 6 as a purely ministerial, legislative vote-counting event."  Caldwell, *supra,* at 15 (citation omitted).

The three Senators and former Vice President Mike Pence whom DeCarlo quotes (Mot. at 8) could not amend these statutorily mandated features of the certification.  Article III judges, not our elected representatives, are tasked with interpreting our nation's laws.[3]  Moreover, none of the quoted speakers was addressing the precise question at issue here.  While the three Senators quoted all believed objections would not be well taken, whether because there was no indication that "any State legislature or secretary of state or Governor or Lieutenant Governor had any intention to alter

---

[3] DeCarlo cites *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976), to argue that the Senators' comments are "probative."  (Mot. at 8).  *Algonquin* is inapposite.  In *Algonquin,* the Supreme Court cited statements of the sponsors of the legislation at issue, as well as other statements made during the floor debate over the legislation.  *Id.*  None of the officials quoted by DeCarlo, however, were involved in the passage of 3 U.S.C. § 15; in fact, none had even been born.  Their statements thus are not part of the legislative history of the statute's passage. Even if they were, they could not override the plain language of the statute, which permits and describes a procedure for adjudicating objections.  *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002) ("Floor statements from two Senators cannot amend the clear and unambiguous language of a statute. We see no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text.").

the slate of electors" (Sen. Lee); or because the vote was "certified by every State in the Union and confirmed by the courts many times" (Sen. Schumer); or because objections were permitted in "extreme circumstances" (Sen. Toomey), they did not deny that objections were allowed. 167 Cong. Rec. S14-05 (2021) (statements of Sens. Schumer and Toomey), S18-02 (2021) (statement of Sen. Lee). Senator Schumer asked his colleagues to "vot[e] in large and overwhelming numbers to defeat these objections"; he did not deny that Senators lacked the ability to object. 167 Cong. Rec. S14-05, 167 Cong. Rec. S14-05, S15 (Jan. 6, 2021). DeCarlo also ignores the context in which the quoted statements (all from January 6) occurred: violent rhetoric followed by a frenzied mob storming the Capitol and forcing the evacuation of Congress, all in the name of disrupting the certification—which might have prompted some Senators to downplay the importance of that proceeding. DeCarlo's quotation from Vice President Pence is even less persuasive, given the Vice President's other comments emphasizing the importance of the certification:

> While my role as presiding officer is largely ceremonial, **the role of the Congress is much different** . . . I welcome the efforts of Senate and House members who have stepped forward to **use their authority under the law to raise objections and present evidence** . . . Those who suggest that raising objections under the Electoral Count Act is improper or undemocratic ignore 130 years of history…"

Letter from Michael R. Pence to Congress, January 6, 2021, *available at* https://int.nyt.com/data/documenttools/pence-letter-on-vp-and-counting-electoral-votes/9d6f117b6b98d66f/full.pdf (last visited Dec. 13, 2021) (emphasis added). More fundamentally, though, none of the officials quoted questioned the level of formality involved in the certification. Thus, none of their statements could be read to undermine this key feature that classifies the certification as an "official proceeding."

## II.     The indictment is not void for vagueness

DeCarlo next claims that the obstruction statute the statute is "void for vagueness as applied to the defendant's conduct" because he cannot commit obstruction by "walking through the Capitol Building," which is how he characterizes the allegations against him.  (Mot. at 12).  DeCarlo's argument fails because it misconstrues both the law and the indictment.  *See Sandlin*, *supra*, at 18-26; *Caldwell, supra,* at 16-25; *Mostofsky, supra,* at 23-24 (rejecting vagueness challenges to Section 1512(c)(2)).  Section 1512(c)(2) is not unconstitutionally vague, and DeCarlo's conduct—which includes invading the Capitol on January 6 as part of a mob—fits squarely within it.

### A.  Vagueness doctrine

An outgrowth of the Due Process Clause of the Fifth and Fourteenth Amendments, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).  To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'"  *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because reasonable jurists might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*,

18

415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'"  *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)).  A statute is instead vague where it fails to specify any "standard of conduct . . . at all."  *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).  "As a general matter," however, a law is not constitutionally vague where it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'"  *Johnson*, 576 U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).  There is a strong presumption that a statute is not vague.  *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").

### B.  "Corruptly" is not unconstitutionally vague as applied to DeCarlo's conduct

DeCarlo's vagueness challenge focuses on the term "corruptly," which he claims has been "consistently held" to "raise notice/vagueness problems."  (Mot. at 8).  Not so.  Many courts, including the D.C. Circuit, have upheld the term "corruptly" as passing constitutional muster in the context of related obstruction statutes.  *See, e.g.*, *United States v. Morrison*, 98 F.3d 619, 630-31 (D.C. Cir. 1996) (rejecting vagueness challenge to "corruptly" under Section 1512(b)); *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18

U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503).

Because "corruptly" is not defined in the statute, it is "understood . . . to have its ordinary meaning." *United States v. North*, 910 F.2d 843, 881 (D.C. Cir. 1990) (*per curiam*), *withdrawn and superseded in part by United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (*per curiam*). For purposes of Section 1512(c)(2), the term "corruptly" has been construed as having two components: (1) intent to obstruct, impede, or influence; and (2) wrongfulness. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose" and "with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing" (internal quotation marks omitted)); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c) ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice."); *see also Mostofsky, supra,* at 23 ("corruptly" requires that a defendant act "'unlawfully, and with the intent to obstruct[,]' impede, or influence an official proceeding") (citing *Sandlin, supra,* at 26); *Caldwell, supra,* at 23 (noting that, "at the very least," corruptly "requires Defendants to have acted with consciousness of wrongdoing"). The reach of the term "corruptly" in Section 1512(c)(2) is also limited by the "nexus" requirement, namely, that the defendant "contemplated a particular, foreseeable proceeding, and that the contemplated

20

proceeding constituted an official proceeding." *United States v. Young*, 916 F.3d 368, 386 (4th Cir.), *cert. denied*, 140 S. Ct. 113 (2019) (citation omitted).[4]

DeCarlo cites two cases for the proposition that courts have "consistently" held that "corruptly" raises "notice/vagueness problems." (Mot. at 11-12). He does not explain how either case demonstrates that Section 1512(c)(2) is vague as applied to him. Neither citation persuades.

DeCarlo first cites *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which addressed a separate statute, 18 U.S.C. § 1505, that prohibited "corruptly" obstructing a congressional inquiry. The D.C. Circuit held that the term "corruptly" was "vague . . . in the absence of some narrowing gloss." *Id*. at 378. *Poindexter* found that the statute "does not at all clearly encompass lying to the Congress," *id*., and "the term 'corruptly' [was] too vague to provide constitutionally adequate notice" as to which lies it prohibited, *id*. at 379. The court disclaimed any conclusion that "'corruptly'" in Section 1505 was "unconstitutionally vague as applied to all conduct." *Id.* at 385. The court also declined to adopt as a standard that "'corruptly' means that in acting, the defendant aimed to obtain an 'improper advantage for [himself] or someone else inconsistent with official duty and rights of others.'" Id. at 385-86 (quoting *North*, 910 F.2d at 881-82).

---

[4] DeCarlo suggests that Section 1512(c)(2) criminalizes only "core" behavior, "such as suborning the vote certification through bribery or other malfeasance" or "threats or actual violence." (Mot. at 12). The reference to "core" behavior appears to come from *Poindexter,* which, as discussed here, does not control the meaning of "corruptly" in Section 1512(c)(2). DeCarlo is essentially arguing that the indictment must allege that he sought to corrupt another person (what bribery, threats, or violence might accomplish), but, as *Caldwell* persuasively explains, corruption of another person is not required under 1512(c)(1) or (2). *Caldwell, supra,* at 18-23. Rather, a person must act "corruptly." *Id.* at 23. As explained above, acting "corruptly" requires the intent to obstruct as well as consciousness of wrongdoing. DeCarlo's narrow view is thus not supported by the law.

*Poindexter* is inapposite for three reasons.[5]  *See Caldwell, supra,* at 18-23 (distinguishing *Poindexter*); *Sandlin, supra,* at 20-21 (same).   First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly" and expressly declined to hold "that term unconstitutionally vague as applied to all conduct."  951 F.2d at 385.  Five years later, in *Morrison*, 98 F.3d at 629-30, the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial.  As noted above, other courts have rejected vagueness challenges to the term "corruptly," recognizing "the narrow reasoning used in *Poindexter*" and "cabin[ing] that vagueness holding to its unusual circumstances."  *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also Caldwell, supra,* at 21 ("every circuit court to have considered *Poindexter* has cabined it to its facts, and no court of appeals, including the D.C. Circuit, has read *Poindexter* to mean . . . that the term 'corruptly' in any obstruction statute is fatally vague.").  DeCarlo's incantation of *Poindexter* accordingly fails to establish that § 1512(c) suffers the same constitutional indeterminacy.  Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen*.  There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil."  *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) (citation omitted).  In doing so, the Court "did not imply that the term was too vague."  *Edwards*, 869 F.3d at 502.

Third, as the citations at pages 19-20 above show, courts have encountered little difficulty defining "corruptly" for purposes of § 1512(c)(2) following *Arthur Andersen*.  Such efforts

_____

[5] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459.  As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, *personally or by influencing another*, including making a false or misleading statement." (Emphasis added).

demonstrate that the statute's "corruptly" element is not so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).

In addition to *Poindexter*, DeCarlo cites only one other case, *United States v. Barry Bonds*, a two-paragraph *per curiam* opinion in which the Ninth Circuit reversed the baseball star's conviction under 18 U.S.C. § 1503 on materiality grounds after he gave a non-responsive answer to a question in the grand jury. *Bonds,* 784 F.3d 582 (9th Cir. 2014). DeCarlo includes a block quotation from *Bonds* to argue his point, but he does not disclose that the quotation is in fact from a concurring opinion; it is not the opinion of the court. (*See* Mot. at 11) (citing *Bonds,* 784 F.3d at 583-84) (Kozinski, J., concurring). The concurrence provides no support for this motion. First, it is specific to Section 1503, which criminalizes obstructing the "due administration of justice"; Judge Kozinski expressed concern that the "bread and butter" of litigation could qualify. *Bonds,* 784 F.3d at 584. Second, notwithstanding concern about the scope of Section 1503, the concurrence did not declare that provision unconstitutional on vagueness grounds or otherwise. *See id*. Moreover, the concurrence's warning about the reach of the term "corruptly" in Section 1503 drew from the Ninth Circuit's broad definition of "corruptly" in an earlier Section 1503 case*,* which interpreted "corruptly"—that a defendant act "with the purpose of obstructing justice," *id.* (citing *United States v. Rasheed,* 663 F.2d 843, 852 (9th Cir. 1981))—less stringently than courts interpret the same term in Section 1512(c)(2). *See supra*, at 20 (noting that "corruptly," for the purposes of Section 1512(c)(2), requires an intent to obstruct an official proceeding and consciousness of wrongdoing).

### C.   The indictment alleges that DeCarlo acted "corruptly" to obstruct the certification.

At this stage in the proceedings, it is enough that the indictment alleges the elements of obstruction of justice as set out under § 1512(c)(2)—namely, that the defendant: (1) corruptly, (2) did or attempted to obstruct, influence, or impede an official proceeding, that is, a proceeding before Congress, by, among other things, entering and remaining in the United States Capitol without authority. *Ring*, 628 F. Supp. 2d at 223; *see Caldwell, supra*, at 27.  The indictment in this case, however, goes further, showing that DeCarlo's conduct "fall[s] on the obviously unlawful side of the line." *Sandlin, supra*, at 24.  "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness," so his challenge must fail. *Parker v. Levy*, 417 U.S. 733, 756 (1974).

As the indictment alleges, the entire Capitol complex was barricaded and off limits to the public on January 6, 2021.  Indictment ¶ 6.  The Joint Session convened in the Capitol at 1:00 p.m. that day to certify the Electoral College vote. *Id.* ¶ 7.  A crowd gathered outside the Capitol perimeter and, despite Capitol Police efforts to maintain order, members of the crowd forced their way inside the Capitol. *Id.* ¶ 8.  At 2:20 p.m., members of Congress were evacuated from their respective chambers as the result of the rioters' breach. *Id.* ¶ 9.  The Joint Session was halted while law enforcement officers worked to restore order and clear the Capitol building and grounds of the unlawful occupants. *Id.*  It took hours for law enforcement to regain control of the Capitol, and the Joint Session did not reconvene until 8:00 p.m. *Id.* ¶ 10.

Defendants participated in the riot.  After the first wave of rioters breached the building, they "forcibly entered the Capitol to stop, delay, and hinder Congress' certification of the Electoral College vote" and "traveled throughout and occupied the Capitol building."  Indictment ¶¶ 25, 30. They defaced a door with the words "Murder the Media" and stole a pair of handcuffs belonging

to the U.S. Capitol Police.  *Id.* ¶¶ 27-28.[6]  Despite DeCarlo's claim that he engaged in no "malfeasance" (Mot. at 12), the indictment is replete with allegations of wrongdoing.  These allegations, which the Court must accept at this stage, would permit a jury to find that Ochs and DeCarlo acted intentionally to obstruct the certification, and also did so with consciousness of wrongdoing, engaging in illegal acts including trespass, depredation, and theft. DeCarlo's description of the indictment—that he was just "walking through the Capitol" and is being prosecuted based on "mere presence" (Mot. at 12)—grossly understates what he is actually alleged to have done.  Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c)'s "corruptly" element provided "fair notice" to DeCarlo that *this conduct* was criminal.  It could be found "corrupt[]" within the meaning of Section 1512(c)(2), as that term has been defined and upheld by the appellate courts.  *See, e.g.*, *Friske*, 640 F.3d at 1291.  DeCarlo's vagueness challenge accordingly fails.[7]

---

[6] Paragraphs 1-14 and 19-28 are alleged in Count One, the conspiracy charge, and are incorporated by reference into the obstruction charge, Count Two.  Indictment ¶ 29.

[7] In a footnote, DeCarlo claims that the government has been "so inconsistent" in its charging decisions" that it "raises the very serious specter of unfettered prosecutorial discretion." (Mot. at 12 n.5).  "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion when and whether to institute criminal proceedings, or what precise charge shall be made.  *Sandlin*, *supra*, at 17 (quoting *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016)).  None of the Capitol breach defendants are the same, and although "'[d]isparate charging in different circumstances may be relevant at sentencing,'" "they are not an appropriate consideration at this stage."  *Id.* at 18 (quoting *United States v. Griffin*, 21-cr-92, 2021 WL 2778557, at *7 (D.D.C. July 2, 2021); *see also Caldwell, supra, at* 17 ("Nor can the court identify any vagueness problem from the fact that other January 6 defendants have not been charged under section 1512(c)(2). Discretionary prosecutorial decisions cannot render vague as applied a statute that by its plain terms provides fair notice").

Additional details of DeCarlo's involvement in the Capitol riot further demonstrate why Section 1512(c)(2) is not vague as applied here, demonstrating intent to obstruct and consciousness of wrongdoing.  Approaching the Capitol together, Ochs indicated that the "steal" was taking place there.  When Ochs acknowledged that "we're not supposed to be here," DeCarlo, who now claims he had no notice that his conduct could result in charges other than trespass, responded, "felony charges!  Felony charges!"  Ochs and DeCarlo could hear and see signs of clashes between law enforcement officers and rioters: clouds in the air and flash bangs.  Nonetheless, they entered the Capitol.  Inside, Ochs acknowledged what they had done: "we stormed the fucking Capitol and made Congress flee."  Later that day, Ochs declared, "as we've been saying all day, we came here to stop the steal."  DeCarlo interjected "we did it" to which Ochs replied, "we were being sarcastic, but we didn't know we were actually going to . . . ."  DeCarlo then asked "Wait, you were being sarcastic?"  Ochs answered, "I was being a bit facetious," to which DeCarlo replied, "Oh no, dude, that's what I came down here to do. We fucking did it."  Ochs then said, "It may resume, but the steal is for now stopped.  You're welcome, America!" to which DeCarlo replied, "we did our job. We did our job."[8]

DeCarlo also suggests that because he did not enter the Senate Chamber or Gallery, and because members of Congress were likely unaware that he was in the building, he lacks "fair notice" that he committed obstruction.  (Mot. at 11-12).  He is wrong.  The allegations do provide notice of his criminal conduct: breaching the Capitol (which DeCarlo, like any reasonable person, recognized on January 6 was illegal) to stop or delay the certification.

---

[8] While defendants are free to argue at trial that they were being "sarcastic" or "a bit facetious" as they stormed the Capitol with a mob, their vagueness challenge does not turn on whether they might dispute the allegations against them or argue for a different interpretation of their statements, particularly at the motion to dismiss stage.

Moreover, even if DeCarlo and Ochs did not conspire with any other member of the riotous crowd that breached the Capitol, and "their alleged criminal conduct is limited to their own actions," (Mot. at 11)[9], not only did he enter the Capitol illegally, he did so as part of a mob.  The Court cannot ignore this context.[10]  The riot relied on numbers to overwhelm law enforcement. As any reasonable person would understand, a mob can (and did) threaten and disrupt Congress in a way that one individual likely cannot.  DeCarlo notes that he was not on the Senate Floor, but the Senate was evacuated before *any* rioters entered; at that moment, the certification had surely been obstructed, though no Senator may have been aware of any particular individual's presence, nor had any person breached the gallery or the Senate Floor.  Staffers hiding under their desks were likely not aware of any specific rioter's presence, but the threat of a mob that had overrun the barriers outside was enough.  To the extent DeCarlo's argument asks the Court to pretend that he and Ochs were the only two people inside the Capitol that day and are being prosecuted "merely" because they stepped over the threshold of the building, devoid of any context, the Court

---

[9] DeCarlo suggests that the government's response to his request that it specify the identities of coconspirators alleged in Count One was a bill of particulars.  (Mot. at 5, 11).  He misconstrues the government's response.  The government's disclosure was not a bill of particulars: "without conceding that a bill of particulars is appropriate," the government wrote, it provided "information regarding the conspiracy allegation," informing DeCarlo that "currently, we would seek to prove at trial that Nicholas DeCarlo conspired…with Nicholas Ochs."  The government then stated, "the investigation into the events of January 6 remains ongoing, and we may later determine that other co-conspirators were involved in the conspiracy alleged in the indictment."  The government's response should not be read to limit the indictment for the purposes of a motion to dismiss.  Were the Court to do so, however, it still would not affect the outcome of this motion.  Even if the alleged conspiracy involved DeCarlo and Ochs only, they still obstructed the certification by actions including joining the mob that trespassed past barriers and occupied the Capitol.

[10] This is not to say that an individual who breaches barriers and illegally enters Congress on his or her own (with the requisite intent) could not be guilty of obstruction just because he or she, as a solo actor, would be unlikely to succeed.  Rather, the government is arguing that it need not prove a conspiracy between DeCarlo and other rioters to argue that joining the mob breaching the Capitol is part of DeCarlo's obstructive conduct here.

should decline this invitation.  DeCarlo did not have to personally encounter members of Congress or enter the Senate Chamber to engage in wrongful conduct that was intended to, and did, obstruct the certification on January 6.

Moreover, an individual's obstruction of an official proceeding, like any other number of criminal violations, need not ultimately succeed to be criminal.  Section 1512(c)(2) itself explicitly criminalizes attempt.  DeCarlo also could be convicted for aiding and abetting obstruction of the official proceeding; again, he need not personally cause the evacuation of the chamber to be liable under Section 1512(c)(2).  "In sum, because the government has alleged that the defendants acted corruptly, or unlawfully, and with the intent to obstruct, as defined in § 1512(c)(2), the defendants were on notice that their conduct violated the statute and no more is required at this stage of the prosecution."  *Sandlin*, *supra,* at 26 (citation omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the DeCarlo's motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:   __*/s/ Alexis Loeb*_____
Alexis Loeb
Assistant United States Attorney
Detailee
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Phone: 415-436-7168
Email: Alexis.Loeb@usdoj.gov