## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | |
| **NICHOLAS DECARLO,**<br>also known as "Dick Lambaste,"<br>also known as "Dick NeCarlo," | **Case No. 21-cr-73-2 (BAH)** |
| and | |
| **NICHOLAS R. OCHS,** | |
| **Defendants.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM FOR NICHOLAS R. OCHS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Nicholas Ochs to a high-end sentence of 51 months' incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment.

## I.     INTRODUCTION

Proud Boys Elder Nicholas Ochs participated in the January 6, 2021 attack on the United States Capitol—a violent attack that interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.8 million  in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United

Ochs, who engages in "media work," was previously a Marine, Proud Boys Elder (member of a small a senior leadership group within the organization) the 2020 Republican nominee for a seat in the Hawaii House of Representatives, and a rideshare driver. In the days immediately following the 2020 presidential election, Ochs told his fellow Proud Boys that he was prepared to "chimp out" if the result wasn't overturned, and his favored candidate – Donald Trump – installed. On January 6, he made good on that crude plan: throwing a smoke bomb at police, smoking cigarettes in the Rotunda, pointing rioters toward the Speaker's Office, celebrating with fellow Proud Boys, and flashing a thumbs-up sign as he posed in front of "Murder the Media" graffiti his co-defendant and Nicholas DeCarlo had scrawled on one of the Capitol's doors, among other conduct.

These were no teenage pranks. Ochs' conduct targeted the police and Congress – and like the conduct of every rioter that day, threatened democracy itself. By attempting to inject humor and a carnival atmosphere into the breach (a breach that had staffers hiding under desks and officers fearing for their lives), Ochs created an environment that downplayed the threat, normalized violence, and encouraged the rampant lawlessness that unfolded at the Capitol. And, as a Proud Boys Elder, he took part in chats involving the group's leaders and was aware of, at a minimum, the potential for violence at the Capitol that day. He gleefully took part in the attack nonetheless.

The government recommends that the Court sentence Ochs to 51 months' incarceration, within the advisory Guidelines' range of 41-51 months, which the parties have agreed is the correct

States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Guidelines calculation. A 51-month sentence reflects the gravity of Ochs' participation in the attack on the Capitol, in light of his role as an Elder – participation which included both acts of violence and property damage – to say nothing of the psychological scars of the many victims and damage to the institution of democracy that the attack caused...

## II.    FACTUAL BACKGROUND

### A.    Ochs' Role in the January 6, 2021 Attack on the Capitol

As set out more fully in the statement of offense (ECF No. 82 at ¶¶ 8- 23), Ochs participated in the attack on the United States Capitol, an attack that disrupted the peaceful transfer of power after the November 3, 2020 presidential election and caused extensive damage and injury.

### *Ochs' Participation Proud Boys' Discussions Regarding the 2020 Presidential Election and January 6*

Leading up to January 6, 2021, Ochs participated in several Proud Boys chats on an encrypted messaging application, including one called "Official Presidents' Chat" and one called "Skull and Bones." Skull and Bones consisted of a small group (approximately twelve) of the Proud Boys' Elders, including Enrique Tarrio and Ethan Nordean, both of whom have been charged with seditious conspiracy and other crimes for their roles leading the Proud Boys on January 6. *See United States v. Nordean et al.,* 21-cr-175 (TJK). Some of these chats ended and then were reconstituted (because of concerns about being "compromised") in the days leading up to January 6.

Ochs explained the role of the Elder in a message sent on the Official Presidents' Chat on September 18, 2020: "High judge/supreme court is kinda what the elders is. It's needed for shit that goes beyond chapters. Something decently serious in that category happens once a month or so." In a December 15, 2020, message in Skull and Bones, Ochs also stated he was trying "to be

involved with all presidents concerns." On August 30, 2020, while campaigning to be chosen as an Elder in the Official Presidents' Chat, Ochs made distrust of the police and federal government part of his platform: "This is nothing new coming from me, but you need to reiterate the NO TALKING TO COPS AND FEDS rule . . .vote me for elder. I won't talk to cops."

 Following the November 2020 presidential election, Ochs discussed with his fellow Proud Boys the anticipated results of the 2020 Electoral College vote, and the possibility of a violent response against it. In Skull and Bones, on November 7, 2020, the group reacted to Biden being declared the winner of the election. Tarrio said, "Dark times if it isn't reversed…and if it's reversed…civil war." Another user commented, "It's civil war either way."

Ochs disagreed: "It's really not. The odds are with us because of the Supreme Court boys. I'm pro violence but don't blow your load too soon." He continued, "Not to be an anti-murder buzzkill but I really think this ISN'T fucked. Once it is, let's go wild." Ochs advised the group, "Bush/gore ruling took till December…Trump has a MUCH stronger case." Ochs said, "Americans are weak and don't want to fight. Them more so than us, but what's really going to matter to the common man is what the Supreme Court says. And it will say."

Another member noted, "Interesting that Trump got that woman through just before this huh. Could be the ace up his sleeve." Ochs agreed and reiterated his belief that the Supreme Court was the best option to overturn the election: "Don't fuck up the ruling. It's a better chance than fighting." He advised the group not to turn violent yet: "Not till the law enforcement institutions [are] weakened or more on our side. We lose right now." But he told the group: "I'll still chimp out if I'm wrong about the Supreme Court tho…we just have to TIME IT RIGHT and DO IT

SMART." Another member proposed that "veterans with combat experience" should "form militias."

Ochs also expressed optimism in Parler posts that the Supreme Court would overturn the election results, including an image of Justice Thomas as a video game character:







Ochs' prediction that the Supreme Court would overturn the election results did not come true. Instead, courts rejected dozens of lawsuits challenging the election results. On December 19, 2020, then-President Trump invited his followers to Washington, D.C. for a "wild" protest. The Proud Boys' chats soon filled with talk of what they would do there.

The same day as Trump's December 19 tweet, in the small-group Skull and Bones chat, one member said, "Trump is calling for proud boys to show up on the 6th." Ochs, Tarrio, and others then discussed arranging a conference call.

The following day, on December 20, 2020, Tarrio created an encrypted message group called MOSD (which stands for "Ministry of Self Defense"), which included Ochs, along with Tarrio, Nordean, and other Proud Boys members.[2] In communications with the group in a separate MOSD leadership chatroom, Tarrio explained that the MOSD was a "national rally planning committee" of the Proud Boys that would include "hand selected members." Tarrio planned for MOSD to have a "top-down structure."

On January 1, 2021, in the Skull and Bones chat, Ochs said, "Aight see some y'all in DC." On January 2, in the Main MOSD chat, one user wrote, "It would be foolish to not wear body armor to DC. Lots of normies and militia groups will be doing the same and not wearing colors may embolden the normies that armor is normalized." A discussion of where to obtain and how to order body armor ensued.[3] A few hours later, another user wrote, "going to be good to see you again." Ochs replied, "can't wait."

---

[2] There were multiple related Proud Boys chats whose names included "MOSD." The Main MOSD chat had approximately 50 members.

[3] It is likely that Ochs saw this The Ministry of Self Defense was a small group – consisting of 50

Members also discussed the election results, frequently expressing anger. On January 2, one user wrote: "Fuck peace." On January 3, one user noted "1776 flag flying over the White House last night." Another responded, "Gonna be war soon," and the user responded, "Yes Sir time to stack those bodies in front of Capitol Hill," to which another user responded with the Proud Boys slogan "Uhuru!"[4]

Chatter regarding operational plans continued. In response to a question about 10-man teams, one user explained, "So none of our 10 man groups will be with the non MOSD guys." Another user said, "Any word on the event logistics yet or we waiting til the day of to divulge." Tarrio responded, "Still in planning phase because of changes of venue that are constantly happening." A user asked Tarrio on January 3 if he had made a separate chat for the non-MOSD participants, "that way these guys have a place to plan." Users discussed stab vests.

Also on January 3, a user in the chat shared that Senator Toomey of Pennsylvania had announced he would support the certification. Other members of the MOSD made various statements about attacking the Capitol. In response to the question, "what would they do [if] 1 million patriots stormed and took the capital building. Shoot into the crowd? I think not," one user responded, "They would do nothing because they can do nothing."

Ochs was also a member of a Proud Boys encrypted chat called "Ministry of Self Defense - Op," which another member described, on January 3, 2021, as "the operations channel to discuss

---

members – created shortly before January 6.  As explained below, Ochs viewed himself as a leader of Proud Boys on the ground.  In that capacity, one would expect him to follow the group's messages in one of a small number of chat groups specifically devoted to January 6 in which he participated.  Moreover, Ochs responded to a different message that same day, showing that he was participating in the group.

[4] "Uhuru" is a Swahili word meaning "freedom" or "independence."

DC and future operations." For example, some members discussed whether they could fly with their body armor and carry knives in D.C.[5]  The chat included approximately 35 members, in addition to Ochs.

The next day, January 4, a user in the MOSD Main chat wrote "It's time to end these crooked thieving fake ass politicians career… They all must leave whether it be The police [or] us citizens dragging them out by their hair." That day, Tarrio was arrested in connection with the theft and burning of a banner from Asbury United Methodist Church. At 7:11 p.m., a member posted a message in the MOSD Main chat, which read, "Hey have been instructed and listen to me real good! There is no planning of any sorts. I need to be put into whatever new thing is created. Everything is compromised and we can be looking at Gang charges." The member then wrote, "Stop everything immediately" and then "This comes from the top."

Following Tarrio's arrest, Ochs messaged Nordean the morning of January 5. He said, "I guess we're senior leadership in DC till Enrique is sprung. I'll be in today or tonight. Lemmie know anything relevant." Nordean replied, "Ok will do," and they traded cell phone numbers.

Tarrio was released from the D.C. jail on January 5, 2021, and was ordered to stay out of Washington, D.C. as part of the terms of his release. Ochs asked if the Skull and Bones chat, which included Tarrio, should be deleted. Another user responded, "I did tell him to delete telegram off his phone right before he was arrested, so I'm hoping he listened to me." Ochs sent two responses: "Yep. Smacc it off your phone if there's trouble. Can always redownload no problem" and "*Fed has joined the chat*"

---

[5] Ochs did not respond to these messages, although, on January 3, 2021, he wrote, "Well, maybe people will go out of their way not to be stabbed by us now."

On January 5, in in a reconstituted version of the Main MOSD chat created the evening of January 4, another user sent a message with instructions for the next day: "Everyone needs to meet at the Washington Monument at 10am tomorrow morning! Do not be late! Do not wear colors! Details will be laid out at the pre meeting! Come out []as patriot!"[6]  Another user told the others to "stand by for the shared baofeng [radio] channel and shared zello channel, no colors, be decentralized and use good judgment until further orders."

### *Ochs and DeCarlo's Coordinated Travel to D.C.*

In early January, 2021, Ochs and DeCarlo coordinated their travel to D.C. with assistance of another individual involved in their "Murder the Media" outlet. They both created fundraisers on GiveSendGo to fund their travel; Ochs raised around $300. Ochs' fundraiser stated the following:

> It's an alt-media dream team: Ochs and Dick Lambaste are going to DC because the president asked and said it was gonna be wild and that people should wear body cameras. Our sweet boys wouldn't miss it and promise to deliver the heinous, ugly truth to a heinous, ugly city. Despite going as cheaply as possible, we are 100% losing money on this (coming from Hawaii and Texas) and so can ask for a little help without getting exiled to the MEGA-GRIFT HALL OF FAME. We'll be bringing you all the MTMedia content you love and expect. We will try not to get stabbed but if one of us does that's when the real bucks come in so keep an eye out for that fundraiser too. If you do give 37 cents for more, name the dangerous media stunt of your choice and we'll probably consider it. Thanks fam.

Ochs left Hawaii on January 4 and arrived in the D.C. area on January 5. DeCarlo flew from Texas, and they shared a hotel room in Virginia. That night, DeCarlo posted a 15 minute "selfie" video stream titled *BlackVill'd: Twas the Night Before Revolution!!!* to the Murder the Media/ThunderdomeTV Facebook page. DeCarlo said he spoke to "Enrique," "who isn't even

---

[6] Ochs received a similar message in another Proud Boys encrypted chat involving approximately 33 members.

allowed in D.C." and stated that they would be doing a "nice early interview" with Enrique the next day.

### *Ochs' Actions on January 6*

The following morning, Ochs and DeCarlo drove to Washington, D.C. They began filming during their drive to the city and would frequently film themselves throughout the day.[7] They attempted to sound lighthearted and detached in their banter for the camera but did not always succeed. Filming on their drive, DeCarlo said, "we are here to stop the steal."[8] Ochs laughed, and said, "if we don't get there quick, they are going to steal it." DeCarlo said, "you and me Nicky, we're the only ones who can fuckin do it."[9] Ochs replied, "us and our million friends." Grimacing, Ochs said, "It'll be like 3 in the afternoon when Mike Pence fails?"[10] Soon after, DeCarlo asked Ochs, "Why are you being so hopeless?"[11] Ochs scoffed, "a positive attitude will fix it?"[12]

Ochs received messages on the encrypted platform from other Proud Boys. By approximately 12:45 p.m., one user reported that "we are at the Capitol Building." At about 1:15 p.m., he reported "WE ARE WITH 200-300 PBS." Others offered encouragement: "We are literally on the cusp of overthrowing these assholes. Don't quit now."

By approximately 12:45 p.m., Ochs and DeCarlo had joined the throng marching to the

---

[7] Ex. 1 to United States' Report Regarding Video Evidence Described in Statements of Offense, ECF No. 74 (hereinafter "Statement of Offense Video Ex.")
[8] *Id.* at 0:10.
[9] *Id.* at 0:15.
[10] *Id*. at 0:30.
[11] *Id*. at 1:13.
[12] *Id*. at 1:29.

Capitol. They arrived at the West Front of the Capitol and passed into the restricted area.[13]

They narrated their approach for the camera, with Ochs saying, "the steal is in fact right here and we are going to stop it" and pointing toward the Capitol Building.[14]  Below is a still frame from DeCarlo's video showing Ochs gesturing toward the Capitol.



DeCarlo said, "this is where they are going to steal it. And they called on us. They called on us to stop it. We are putting an end to it. They said calling all patriots. And our MVPs. Our MVP VIPs. Nick Ochs and Dick NeCarlo. Live on the scene. We're going to put the kibosh on this."

As they approached the West Plaza, DeCarlo commented, "What a crowd," and Ochs said, "This is a thing."[15]  As the crowd thickened, they paused near partially downed fencing. DeCarlo

---

[13] Statement of Offense Video Ex. 8 at 0:02.
[14] *Id.* at 0:33.
[15] *Id.* at 1:10.

filmed himself laughing:[16]



An individual with a radio on his shoulder (later identified as Proud Boy James Elliott (the defendant in *U.S. v. Elliott,* 21-cr-735 (RCL)) raised his fist to the crowd and led chants of "Whose house?  Our house!"[17]  All smiles, Ochs and DeCarlo began dancing and singing, "Our house – in the middle of our street," echoing the popular song, "Our House," released in 1982.[18]

Their gleeful reaction to the growing threat continued. Pointing his camera to the media tower, which rioters now stood atop, DeCarlo asked, "Should we try to climb that thing?"[19] Ochs said, "we're not supposed to be here, this is, like, beyond the fence." Neither, however, saw this as much of a problem. DeCarlo responded, "Oh really?" and Ochs said, "Yeah dude." They

---

[16] *Id.* at 1:57.
[17] *Id.* at 2:15.
[18] *Id.* at 2:24.
[19] *Id.* at 2:50.

13

laughed:



DeCarlo said, "we're all felons, yeah!" Ochs echoed: "Yeah!"  DeCarlo started chanting, "Felony charges! Felony charges!"[20]

Ochs admitted, "I'm liking this…feels kind of real."[21] DeCarlo observed, "it's getting aggressive." The giddiness continued. Ochs joined chants of "Stop the Steal!"  DeCarlo said, "I'm working on it!...Guys, I'm trying."[22] He then told a joke about how "you can't be the last one chanting."

DeCarlo and Ochs moved toward another set of fencing on the West Front. DeCarlo said, "you guys see this fence?  Torn down!" as Ochs gestured toward it:[23]

---

[20] *Id.* at 3:05.
[21] *Id.* at 3:20.
[22] *Id.* at 4:00.
[23] *Id.* at 4:49.



   They then moved past the fence, not far from scaffolding in place for the inauguration. After rioters overwhelmed the small number of police officers guarding the scaffolding, Ochs and DeCarlo moved underneath it with the crowd.[24] The crowd pushed, and rioters began coughing from the effects of pepper spray.[25]  Ochs filmed rioters passing a bicycle-rack barricade and using knives to cut through the fabric covering the scaffolding.[26]  Flash bangs exploded just outside the scaffolding.[27] Ochs and DeCarlo met another Proud Boy and introduced themselves.[28] Perhaps because of the pepper spray (DeCarlo had donned a face mask by that point), they walked back out from under the scaffolding and returned to the West Plaza. By then, the conflict between rioters and police had intensified: Ochs filmed rioters spraying the police and metal rods flying through the air toward the police line.[29]

---

[24] Statement of Offense Video Ex. 10.

[25] *Id.* at 0:40-1:00.

[26] Statement of Offense Video Ex. 11

[27] *Id.* at 1:23

[28] *Id.* at 2:43

[29]  Statement of Offense Video Ex. 13 at 0:01.



Ochs and DeCarlo then joined the physical attacks on the embattled police officers. DeCarlo then threw a smoke grenade at the police, and exclaimed, "Oh fuck, I just threw it without pulling the pin. God damn it."[30]

---

[30] Statement of Offense Video Ex. 12 at 1:10-1:20; Statement of Offense Video Ex.13 at 0:28.



Below is a close-up image of DeCarlo with his arm cocked, holding the smoke grenade:



Ochs then threw a smoke bomb too.[31]

---



The follow still frame shows the projectile flying through the air toward the police line.



Neither Ochs nor DeCarlo filmed themselves throwing these objects – but they were captured by a third party, and Ochs' cell phone, pointed elsewhere, nonetheless captured the audio.

Ochs and DeCarlo moved farther away as they attempted to recover from the effects of OC spray (which Ochs referred to as "CS gas"). As they stood near a fence, Ochs said, "a little pepper spray never hurt nobody."[32]   DeCarlo noted the "endless fucking crowd in several directions," calling it "fucking beautiful." Ochs said, "we're good. This happens sometimes…I just got CS

---

[32] Statement of Offense Video Ex. 13 at 1:47.

gassed." Someone offered Ochs water; he said, "I'm used to it. I go to these things." DeCarlo added, "this ain't our first pepper spray."[33]

DeCarlo and Ochs then returned to the scaffolding, which rioters had broken through, and climbed the stairs to the Upper West Terrace, approaching an entrance to the Capitol Building. On the staircase, DeCarlo turned toward the crowd behind him and yelled, "Let's go!"[34] Reaching the Upper West Terrace, they filmed the large crowd gathered below. DeCarlo said, "you think they are scared in there?"[35] Ochs replied, "yeah, and I fucking love it!"

At approximately 2:23 p.m., Ochs and DeCarlo entered the Capitol through the Senate Wing Doors as alarms blared.



---

[33] *Id.* at 2:34.
[34] Statement of Offense Video Ex. 14 at 1:15.
[35] *Id.* at 3:02.

They turned right and walked down a hallway. They entered the Senate Spouses' Lounge. DeCarlo cackled, "isn't this nice. What a lovely room." [36] Ochs and DeCarlo took selfies seated at a conference room table.

As they walked down a hallway and through an atrium, Ochs yelled, "it's a beautiful tour of the Capitol. With Murder the Media!" [37] They arrived at the Crypt of the Capitol at approximately 2:26 p.m., just after rioters had overwhelmed the police line there. Ochs and DeCarlo walked around, laughing and filming. They then decided to smoke cigarettes. DeCarlo said, "this is an occasion." [38] He said, "look at all the shit you can't do in here. This is our fucking building." [39] Ochs held up his cell phone, and DeCarlo commented, "Congress goes into lockdown." [40] He then began to yell, "where's Nancy?  Where you at, Nancy?"  He yelled, "what else can we take?" and then joined chants of "Our house," no longer appending the song lyrics he had earlier. [41]

Ochs and DeCarlo appeared to be enjoying the experience and saw their time in the Capitol as cause for celebration. They posed for pictures with their cigarettes. Ochs posted a photograph to social media with the caption "Hello from the capital lol."

---

[36] Statement of Offense Video Ex. 18 at 1:20.
[37] *Id.* at 2:54.
[38] *Id.* at 3:48.
[39] *Id.* at 3:48.
[40] *Id.* at 4:38.
[41] *Id.* at 4:50.







Capturing the moment for a third platform, Ochs also filmed a selfie video for an encrypted application.



After the breach of the police line in the Crypt, a group of officers retreated toward the Capitol Visitors' Center. They attempted to close crash doors in a hallway off the Crypt to prevent the rioters from entering. The rioters jammed the crash doors, however, by sticking objects underneath them so that they could not close. As one individual stuck a flagpole underneath the door, wedging it open, Ochs and DeCarlo stood nearby, filming and laughing.[42]  In the first still frame below, a red arrow points to the door that the rioters wedged open with the blue flag. The second is a still frame from DeCarlo's video showing the flag jamming the door.[43].

---

[42] Statement of Offense Video Ex. 21 at 0:10.
[43] *Id.*

23





DeCarlo saw a staircase to the side and asked, "what's up there?"[44]  Ochs said, "Looks valuable. I bet it's the fucking chamber, dude." They moved toward the stairs and climbed them.[45] Officers were visible at the top, however, and one began walking down the stairs toward them.[46] They walked back down the stairs to the hallway by the Crypt, DeCarlo yelling, "this is our house!"[47] Rioters at the bottom of the stairs asked them what was going on, and DeCarlo said that they were "a little outnumbered up there."[48]

Next, as someone nearby yelled "Advance! Advance!" Ochs and DeCarlo went downstairs to the Capitol Visitor's Center.[49] Ochs and DeCarlo witnessed another standoff between rioters and police, who were guarding tunnels that led to the House and Senate office buildings.



---

[44] Statement of Offense Video Ex. 20 at 0:29.
[45] Statement of Offense Video Ex. 21 at 0:26.
[46] *Id.* at 1:10.
[47] *Id.* at 1:20.
[48] *Id.* at 1:25.
[49] Statement of Offense Video Ex. 23 at 0:16.

They made their way back upstairs to the East Foyer, near the Rotunda Doors. Ochs filmed a blood-like smear of red liquid on the floor.[50]



There, they found Proud Boys Nordean (on the right) and Paul Rae (on the left) (a defendant in *United States v. Jackman*, 21-cr-378 (TJK)), who were in the area with a small group.[51]



---

[50] Statement of Offense Video Ex. 25 at 0:07.
[51] -*Id.* Ex. 25 at 0:33.

After a group hug, DeCarlo continued to explore the East Foyer while Ochs, Nordean, and Rae made their way into the Rotunda. DeCarlo soon joined them there.

Ochs and DeCarlo milled around the Rotunda. At one point, they motioned toward an exit from the Rotunda that led toward Speaker Pelosi's office, yelling "Nancy's office!"[52]



A group of rioters soon gathered there, including Richard Barnett (the defendant in *United States v. Barnett,* 21-cr-38 (CRC), who was photographed that day with his feet on Speaker Pelosi's desk), who yelled at officers that he had left his flag behind in her office and wanted it back. Police, their backs to a stairway, tried to keep the rioters from advancing, but the rioters shoved forward, threatening to push the officers down the stairs before reinforcements arrived and the rioters were repelled.

---

[52] Statement of Offense Video Ex. 28 at 59:40-1:00:10.

Ochs and DeCarlo exited the Capitol at about 3:00 p.m. but did not leave the area. Instead, they walked around outside to the Chestnut-Gibson Memorial Door, where the Capitol Police had left a duffle bag. They rummaged through the bag. DeCarlo stole a pair of flex cuffs.



With a marker, DeCarlo also scrawled "Murder the Media" on the door as Ochs recorded him in the act.



28



They both then posed for photographs in front of the door. In the image below, Ochs is on the left and DeCarlo is on the right.



FBI agents later found this photograph, framed, at DeCarlo's residence:



Ochs and DeCarlo also posed for a photograph with Jacob Chansley, the defendant in *United States v. Chansley,* 21-cr-3 (RCL), also known as the "QAnon Shaman," which was posted to Murder the Media's Parler page.



As they walked away from the Capitol that day, Ochs said, for the camera, "sorry we couldn't go live when we stormed the fuckin' U.S. Capitol and made Congress flee."[53] DeCarlo laughed and flashed a thumbs-up sign.

After they left the Capitol, Ochs and DeCarlo continued to film while still in Washington, D.C. In one video, Ochs stated, "Viewers, . . . we have some good news: . . . We have just, uh, peeked through this window, and on the television the headline reads that Congress stopped the vote when we stormed the Capitol. And, as we've been saying all day, we came here to stop the steal."[54]  DeCarlo interjected "we did it," to which Ochs replied, "we were being sarcastic, but we didn't know we were actually going to . . . ." DeCarlo then asked, "Wait, you were being sarcastic?"  Ochs answered, "I was being a bit facetious," to which DeCarlo replied, "Oh no, that's what I came down here to do. We fucking did it." Ochs then said words to the effect of, "It may resume, but the steal is for now stopped. You're welcome, America!" to which DeCarlo replied "we did our job. We did our job."

CNN interviewed Ochs that night. Ochs claimed to have been there as a professional journalist. He said, "We didn't have to break in, I just walked in and filmed." He said "There were thousands of people in there – they had no control of the situation. I didn't get stopped or questioned." CNN, *Insurrection fueled by conspiracy groups, extremists, and fringe movements,* available at https://www.cnn.com/2021/01/07/us/insurrection-capitol-extremist-groups-invs/index.html (Jan. 7, 2021).

In the Skull and Bones chat, at 4:18 p.m., another member reposted a photograph of Ochs

---

[53] Statement of Offense Video Ex. 32.
[54] Statement of Offense Video Ex. 33.

and DeCarlo smoking cigarettes in the Crypt, and asked, "@Nick_Ochs you inside?  Lol." Ochs replied, "Yeehaw." Soon after, one member said, "So what now," and another (whose username indicated he was from the United Kingdom) said, "from our end it looks like Trump ain't going peacefully." Tarrio responded, "They'll fear us doing it again…"  When asked, "So what do we do now?" Tarrio replied, "Do it again." Another user told Tarrio to "text your boy Don jr and tell him to stfu. This is PB country now."

At 3:54 p.m., in an encrypted chat called "MTMclipz," involving seven individuals, DeCarlo wrote, "Yeah, me and Ochs stopped the steal. You're welcome, America." Just before 7 p.m. that night, in an encrypted chat among members of Murder the Media, however, Ochs wrote, "let's delete that picture of the MurderTheMedia written on the door. Just to be safe."

The next day, Ochs flew back to Hawaii. He was arrested when he landed at the airport and charged with unlawful entry, in violation of 18 U.S.C. § 1752(a). On January 26, 2021, DeCarlo was arrested.

### *Fundraising*

On the fundraising website "GiveSendGo," Ochs started a fundraiser, the "Ochs Family Fund," to "[h]elp an American fighting for his life against selective prosecution." As of November 21, 2022 the fundraiser had raised $14,329.[55] On another fundraising website, GoGetFunding, it appeared that Ochs had raised $1,348 for legal fees. [56] DeCarlo also had a GoGetFunding fundraiser; in a video posted his page, a colleague of Ochs' and DeCarlo's from Murder the Media claimed that they had raised "just shy" of $20,000 for Ochs. [57] The colleague urged followers to

---

[55] https://www.givesendgo.com/OchsFamilyFund
[56] https://gogetfunding.com/relief-for-ochs-legal-fees/
[57] "Nick D. Defense Video," available at https://gogetfunding.com/nick-decarlo-defense-fund/, at

donate through an encrypted site; thus, it is possible that DeCarlo and Ochs raised additional funds of which the government is not aware.

### III.   INDICTMENT AND PLEA AGREEMENTS

On February 4, 2021, a federal grand jury returned an indictment charging Ochs and DeCarlo with Conspiracy, in violation of 18 U.S.C. § 371, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) and (2), and five misdemeanors, including Destruction of Government Property, in violation of 18 U.S.C. §§ 1361 and 2, for defacing the Memorial Door, and Theft of Government Property, in violation of 18 U.S.C. § 641 and 2, for stealing the flex cuffs. ECF No. 17. On February 18, 2022, the grand jury returned a superseding indictment, which removed one of the misdemeanor charges. ECF No. 68. On September 9, both defendants pled guilty to Count Two, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), pursuant to plea agreements.

### IV.   STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, Ochs faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two, Obstruction of an Official Proceeding.

### V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

---

6:36.

The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

Probation's Guidelines calculation is the same as the parties' calculation in the plea agreement. That Guidelines analysis follows:

<u>Count Two: 18 U.S.C. § 1512(c)(2)</u>

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[58] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[59] <u>+3</u> | |
| | **Total** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Total Adjusted Offense Level:** | | **22** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated Ochs' criminal history as category I, which the government does not dispute. PSR ¶ 62. Accordingly, based on the parties' calculation of Ochs

---

[58] As the parties have agreed, U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." As two examples, Ochs and DeCarlo threw smoke grenades at the police, and Ochs aided and abetted DeCarlo's defacing of the Memorial Door.

[59] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Ochs admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

total adjusted offense level, after acceptance of responsibility, at 22, his Guidelines imprisonment range is 41 to 51 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

Under 18 U.S.C. § 3553(a), the factors this Court must consider when imposing a sentence include the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

Ochs' role in the January 6 attack merits a significant term of incarceration. Starting with his conduct on that day: he threw a smoke grenade at the police, directed other rioters toward Speaker Pelosi's office, smoked cigarettes in the Crypt to celebrate the evacuation of Congress, and enjoyed a fellow rioter's effort to jam open crash doors. He filmed throughout the attack, including when his codefendant defaced the Memorial Door with the slogan, "Murder the Media." Out of all this aggravating conduct, throwing a smoke grenade at the police line was particularly dangerous behavior. The police were substantially outnumbered and were trying to defend against threats from right in front of them and threats from those, like Ochs and DeCarlo, whom they could not see.

Within minutes of breaching the restricted area, Ochs recognized that he was not supposed to be where he was. He knew what the fences meant. He gestured toward another fence that was

downed. He reassured others there that he had experience being pepper sprayed. Not only did he

ignore these red flags telling him to turn around, he filmed and pointed them out.  Throughout his

time at the Capitol, he appeared to enjoy the riot as not only a successful obstruction of the

certification vote, but also as an opportunity to thrill and entertain his followers.

But it was nothing of the sort. It was a grave attack on the peaceful transfer of power that

also carried a human cost. When Ochs and DeCarlo motioned rioters toward "Nancy's office,"

there were staffers hiding under their desks there. [60] Moreover, evidence suggests that Ochs did

not see the events of January 6 simply as harmless amusement either. From the days immediately

following the election, he declared himself to be "pro-violence"; he thought the Supreme Court

would turn the election his way but was prepared to revolt if it did not.  He lamented the likelihood

that Vice President Pence would "fail" him.

A word about "Murder the Media," the name of Ochs' and DeCarlo's online platform.

Scrawled on a door to the Capitol, it was both a crude advertisement and a chilling message. The

name of their platform is no accident. DeCarlo and Ochs had expressed disdain for the mainstream

media. Ochs described himself as "pro-violence." The name of their media platform encapsulates

these twin ideologies.

In addition, by trying to create a carnival-like atmosphere inside the Capitol at times, by

acting like directing others to the Speaker's office or jamming open crash doors off the Crypt was

a joke, Ochs and DeCarlo normalized the rioters' behavior. They made it seem like it was all in

good fun, downplaying the threat for their viewers at home, like it was not so out of the ordinary,

---

[60] *Pelosi says staff hid under a table for hours as rioters vandalized her office,* The Washington
Post, available at https://www.washingtonpost.com/nation/2021/01/11/pelosi-60-minutes-capitol-
impeachment/ (Jan. 11, 2021).

and was kind of fun, to participate in the worst attack on the Capitol since the War of 1812. And they very well may have emboldened those around them, by playing the role of an appreciative audience and by acting like the breach was an opportunity for hijinks and laughs. In one article, Ochs acknowledged that he "did my part, I think, to put Trump in office" by "being funny."[61]  He claims to understand how to use his brand of humor for political gain. There is no reason to doubt that he was not attempting to be similarly strategic in his use of humor on January 6.

The Court's assessment of the seriousness of the offense should consider what Ochs did on January 6 in the context of his previous conduct and statements. It should be informed by what Ochs' other communications tell us about his intent. Ochs wanted to overturn the election. He described himself "pro violence" to achieve his desired ends – strategically urging the Proud Boys to "TIME IT RIGHT" and "DO IT SMART." On January 6, he acted in conformity with his support for violence and willingness to take action once the Supreme Court proved unwilling to overturn the results of the 2020 presidential election.

Ochs discussed these objectives with the Proud Boys, many members of whom marched to the U.S. Capitol and committed felonies that day (or stand accused of doing so). *See, e.g., United States v. Pruitt,* 21-cr-23 (TJK), ECF No. 66 at 6-23; *United States v. Elliott,* 21-cr-735 (RCL), ECF No. 27 at 4; *United States v. Bertino,* 22-cr-329 (TJK), ECF No. 5 at 1-12; *United States v. Garcia,* 21-cr-163 (ABJ), ECF No. 31-2 at 2; *United States v. Worrell*, 21-cr-292 (RCL), ECF No. 1 at 15 (two defendants); *United States v. Nordean,* 21-cr-175 (TJK) (six defendants), ECF No. 305; *United States v. Jackman*, ECF No. 21-cr-378 (TJK), 1 at 2; *United States v. Rae,* 21-cr-378-2 (TJK), ECF No.1 at 5-14; *United States v. Kuehne,* 21-cr-160 (TJK), ECF Nos. 132 at 4-8 (six

---

[61] Harrison Patino, Ho'a O'ahu, *Proud Boys in Paradise* (May 14, 2018).

defendants). As an Elder and a member of the Ministry of Self Defense chat formed in preparation for January 6, he was privy to the group's preparations for violence on January 6, as well as the calls for revolution. At one point, he planned to be one of two leaders on the ground that day. He was thrilled to see other Proud Boys inside the Capitol and responded with a "Yeehaw!" to a leadership group when asked if he was inside. He was a leader in the organization that sent people to Washington who attacked officers and stormed the Capitol in service of objectives that he shared and using methods he supported – *i.e.*, violence. He was deeply involved in the group, was informed of unfolding plans, and chose to storm the Capitol all the same. His role as a Proud Boys Elder is aggravating.

In summary, this was a serious offense indeed. Ochs' activities at the Capitol included violence and property damage. He put his preferred political outcome and a desire for admiration above democracy, laughing, celebrating, and filming as the police were overrun by the mob and Congress evacuated. And he was an Elder of the Proud Boys, whose members were some of the most notorious participants in the Capitol attack.

### B.  The History and Characteristics of the Defendant

Ochs served as a Marine. He has no criminal history.

When it comes to January 6, Ochs has been remorseless. After the riot, he contended he was simply acting as a professional journalist merely recording the event, a claim contradicted by, for example, the evidence showing him throwing smoke grenades at police. *See, e.g., Insurrection fueled by conspiracy groups, extremists, and fringe movements,* CNN, https://www.cnn.com/2021/01/07/us/insurrection-capitol-extremist-groups-invs/index.html  (Jan. 7, 2021). His GiveSendGo fundraiser contends that he is being selectively prosecuted for being a

political dissident, refusing to acknowledge that he is in fact before the Court because of his conduct, not his views.

Ochs' history – his deep involvement with the Proud Boys and the actions he has undertaken on their behalf – suggests that his participation on January 6 was not some kind of momentary lapse in judgment. It reflects support for political violence in support of the "Western chauvinism" supported by the Proud Boys. Inherent in the group is support for violence: to attain the highest "degree" of membership (fourth) generally requires engaging in a physical fight with a member of Antifa, and many comments in the Proud Boys' chats support violence. As the founder of the Proud Boys Hawaii, and as an Elder of the group, Ochs similarly was on record supporting political violence (as he said "I'm pro-violence"). And Ochs apparently was not a newcomer to police confrontations on January 6; as he and DeCarlo told others on January 6, they were no strangers to pepper spray.

The Court may also consider Ochs' record of using his platforms to antagonize others. In 2020, for example, Ochs was the Republican nominee for a seat in Hawaii's House of Representatives. According to news reports, his campaign's Facebook page was removed for violating platform policies, and Ochs was criticized for his posts about the Jewish and LGBTQ communities. *See* Alex Hilder, "28-year-old defeats Proud Boys leader to become only openly LGBTQ+ member of Hawaii House," Denver 7 ABC, available at https://www.denver7.com/news/election-2020/28-year-old-defeats-proud-boys-leader-to-become-only-openly-lgbtq-member-of-hawaii-house (Nov. 10, 2020). And while, as noted above, Ochs has no criminal history, the government did receive reports that he engaged in harassing behavior as leader of the Proud Boys. In one incident at the University of Hawaii, he had to be

removed by security officials from the office of the chair of the political science department after he had demanded to be allowed in a meeting with another member of the Proud Boys and a professor, regarding an anti-Semitic sign the other Proud Boy had posted. As a witness reported, when Ochs was excluded from the meeting, he became enraged and pushed his way through a door into the professor's office, knocking her over.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[62] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Ochs' criminal conduct, corruptly obstructing an official proceeding, celebrating the breach by lighting up a cigarette, and defacing a door with "Murder the Media," represents disrespect for the law. When Ochs entered the Capitol grounds, the Capitol itself, it was abundantly clear to him that lawmakers and their staffs, and the law enforcement officers who tried to protect them, were under siege; he told DeCarlo that they weren't supposed to be where they were, provoking DeCarlo's joyous outburst about felony charges.

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[62] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                          at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[63] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

There is some need for specific deterrence here. First, although Ochs has a criminal history category of I, he was an Elder within the Proud Boys, and a founder of the Hawaii chapter, who described himself as "pro violence" and expressed disdain for certain groups (in the guise of "humor") to promote his political goals. He was ready to lead the Proud Boys on the ground on January 6. Notwithstanding his guilty plea, Ochs has not expressed any remorse or contrition. Without some indication that Ochs has renounced, learned from, or even regrets his conduct on January 6, there is a greater possibility that he will do something similar again, and may try to lead others in doing so – either with a group such as the Proud Boys, or through a media platform.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

---

[63] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[64]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[64] The Guidelines ranges in Capitol siege cases may be more likely to understate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. Indeed, these crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

First and foremost, the Court should compare Ochs with his co-defendant, Nicholas DeCarlo. Both should receive significant sentences. DeCarlo did steal flex cuffs. And the Court may give Ochs some credit for his record of military service; DeCarlo has no such background. Ochs' Elder status, and what it meant for his awareness of the group's preparation for January 6, however, justifies a lengthier sentence.

The Court may also wish to compare Ochs and DeCarlo with other defendants it has sentenced for committing the same crime on January 6 – although none of these other defendants were members of the Proud Boys, to the government's knowledge. Ochs' conduct and ties to the Proud Boys make this case more aggravated in many respects than that of Matthew Bledsoe, whom the Court recently sentenced to 48 months' incarceration. *United States v. Bledsoe,* No. 21-cr-204 (BAH). Bledsoe scaled a wall to access the Capitol; Ochs threw a smoke grenade at the police line and aided and abetted the defacing of a door. Gov't Sentencing Mem, *Bledsoe,* No. 21-cr-204, ECF No. 228, at 2. Bledsoe was inside the Capitol for 22 minutes; Ochs was inside for more than twice as long – and then went outside with DeCarlo, where they defaced the door and DeCarlo stole flex cuffs. *Id.* In *Bledsoe,* the government's sentencing memorandum highlighted one picture Bledsoe posted on social media; Ochs and DeCarlo filmed for an audience throughout the breach. Bledsoe was near a mob that chanted, "Nancy! Nancy!  Nancy!" Ochs and DeCarlo pointed rioters

44

toward "Nancy's office" themselves, and DeCarlo yelled "Where's Nancy?" *Id.* at 22. Unlike Bledsoe, however, Ochs has accepted responsibility by pleading guilty, and he has been compliant on pretrial release.

This Court also sentenced Anthony Williams, Case No. 21-cr-377, after trial to 60 months' incarceration for obstruction of an official proceeding. The government did not present evidence that Williams was a member of the Proud Boys or some other organized group (let alone in a leadership role). Like Ochs and DeCarlo, Williams entered the Capitol through the Senate Wing Doors soon after the initial breach. Gov't Sentencing Mem., *United States v. Williams*, No. 21-cr-377, ECF No. 120 at 2. He also smoked in the Capitol (marijuana, not cigarettes). Williams was part of crowds that broke through the police line in the Crypt and resisted leaving the Rotunda, but did not throw smoke bombs at the police, like Ochs.

The Court may also wish to consider the sentence imposed on Joshua Pruitt, a member of the Proud Boys who pleaded guilty to obstruction of an official proceeding. *United States v. Pruitt,* 21-cr-23 (TJK). Judge Kelly sentenced Pruitt to 55 months' incarceration. Pruitt had a more significant criminal history than Ochs and DeCarlo and participated in the riot while on pretrial release. However, like Ochs, Pruitt had an awareness of plans for violence on January 6 from his participation in a Proud Boys chat. Pruitt threw a chair and a sign; Ochs and DeCarlo defaced a door. Pruitt directly confronted officers that day, but did not, to the government's knowledge, commit an assault; Ochs and DeCarlo actually threw smoke grenades at the outnumbered police. And Pruitt was a new Proud Boys initiate – unlike Ochs, who was a member of the group's top leadership.

Finally, the Court should impose a more severe sentence on Ochs and DeCarlo than the

sentences imposed on defendants who obstructed an official proceeding but did not engage in acts of violence against people or property, such as in *United States v. Hodgkins*, 21-cr-118 (RDM). Hodgkins unlawfully entered the U.S. Capitol and made it to the Senate Floor with a Trump flag. There, the United States requested 18 months' imprisonment and Hodgkins was sentenced to 8 months' imprisonment. Hodgkins was the first defendant to be sentenced for a violation of Section 1512(c)(2), having taken very early responsibility for his actions, and he neither committed nor incited violence on January 6. The facts here are different.

## VII.  RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[65] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[65] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ochs must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Ochs played in the riot on January 6.[66] Plea Agreement ¶ 12. As the Court noted at the change of plea, the plea agreement reflected an earlier estimate of damages caused by the riot at the United States Capitol (approximately $1,495,326.55), a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* As of October 14, the government's estimate had risen to $2,881,360.20. As the government noted at the change-of-plea hearing, though, it has not required defendants to agree to pay greater restitution following the upward revision of the damages figure, but it may do so in the future. The $2000 restitution figure is sufficient to encompass the costs associated with painting over the "Murder the Media" graffiti (approximately $92), which was completed within weeks of the Capitol attack.

Ochs' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 117.

## VIII.   FINE

Ochs' conviction under Section 1512 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to

---

[66] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

"capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. Ochs has raised funds in an online campaign. The government located what appears to be a fundraiser for Ochs on the website GiveSendGo, entitled the "Ochs Family Fund," where Ochs has raised at least $14,329.[67]  On another fundraising website, GoGetFunding, it appeared that Ochs had raised $1,348 for a legal defense fund.[68]  Ochs has retained counsel. The total amount raised on these two websites, as of November 21, was $15,677.

Ochs should not be able to "capitalize" on his participation in the Capitol breach. Given that he has retained counsel, the government does not ask the Court to include the money raised for legal defense as part of a fine. The "Ochs Family Fund," however, does not appear to be earmarked for any particular purpose. The government therefore recommends a $14,329 fine.[69] Should Mr. Ochs establish that this fund was to be used for legal expenses, the government may revise its request.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 51 months, which is a high-end sentence as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,000, a fine, and the mandatory $100 special assessment.

---

[67] https://www.givesendgo.com/OchsFamilyFund
[68] https://gogetfunding.com/relief-for-ochs-legal-fees/
[69] Should Ochs raise additional funds between November 21 and the sentencing hearing, the government may increase the amount of the recommended fine.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Alexis J. Loeb*_____
ALEXIS J. LOEB
CA Bar No. 269895
Assistant United States Attorney
Detailed to USAO-DC
U.S. Attorney's Office
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
Office: (415) 436-7168
Alexis.Loeb@usdoj.gov