**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:21CR00073-002 |
| v. | Hon. Beryl A. Howell |
| NICHOLAS R. OCHS,<br>　　　　　*Defendant*. | Sentencing: December 9, 2022, at 11:00 AM |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS**
**POSITION WITH RESPECT TO SENTENCING**

Nicholas R. Ochs, by counsel, respectfully submits this Memorandum in Support of his Position on Sentencing.  For the reasons stated herein, Mr. Ochs requests a sentence of no more than 18 months imprisonment, with a prolonged period of probation, and restitution.  Such a sentence is consistent with the requirements set forth in 18 U.S.C. § 3553 (a) and is consistent with other January 6 defendants who have been convicted of stand-alone violations of 18 U.S.C. 1512(c)(2).

Mr. Ochs recognizes the gravity of his involvement in the events at the Capitol on January 6, the injury caused to the democratic process, and the responsibility he bears for his role in the events of that day.  To that end, on September 9, 2022, Mr. Ochs pled guilty to Count Two of the Superseding Indictment charging him with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) and (2)—which carries with it a maximum punishment of 20 years imprisonment and/or a $250,000 fine.  The issue presented here for the Court to decide in sentencing Mr. Ochs is what sentence is sufficient but not greater than necessary to meet the statutory goals of sentencing.  Accordingly, given: (1) Mr. Ochs' acceptance of responsibility, (2) his short-lived presence inside the Capitol during which there is no allegation that Mr. Ochs assaulted anyone or committed, or even contemplated, any act of violence —Mr. Ochs remained

1

inside the Capitol for 37 minutes, (3) his lack of criminal history, (4) a successful record of 1 year and 10 months of pre-trial supervision, (5) and his personal history and circumstances; a sentence of no more than 18 months imprisonment is sufficient but not greater than necessary to meet the goals of sentencing and is in line with others who have been sentenced for similar conduct.

Moreover, Mr. Ochs' membership and limited leadership role in the "Proud Boys" should not serve as grounds to sentence Mr. Ochs more severely, as the government suggests, than other similarly situated defendants—Proud Boys or otherwise—who committed essentially the same non-violent offenses on January 6. At the September 9, 2022, plea hearing this Court asked Mr. Ochs if he was an "elder" in the Proud Boys which is a term of some meaning—but not much. The fact is that Mr. Ochs served as the "president" of the Hawaii chapter of the Proud Boys starting in or about 2017.   At its peak, there were approximately 13 members of that chapter, and as few as seven.  His status as an "elder" related to issues of membership and was in no way criminal or illegal.  The government has never alleged that Mr. Ochs, or any other member of the Hawaii chapter, committed an act of violence.  And, despite the fact that Mr. Ochs did, by chance and very briefly – less than two minutes –encounter other Proud Boys on January 6, the government makes no allegation, nor could they, that Mr. Ochs conspired with any of the other Proud Boys to violate 18 U.S.C. § 2384 (seditious conspiracy) or take any action that would support any charges arising from the assault of law enforcement officers in violation of 18 U.S.C. § 111 (a)(1).  Other members of the Proud Boys are facing those charges, among other felonies, for actions allegedly taken on January 6 in which Mr. Ochs unquestionably played no part.  *See United States v. Ethan Nordean,* *Joseph Biggs, Zachary Rehl, Enrique Tarrio and Dominick Pezzola,* Case No 21-cr-175 (TJK). As such, and argued in more detail below, Mr. Ochs' membership in the Proud Boys should

provide no basis for the Court to enhance the sentence it imposes, and Mr. Ochs should be sentenced solely for the acts he committed on January 6 and nothing else.

## DISCUSSION

### I.     Nicholas R. Ochs' Actions on January 6th

Mr. Ochs earned a journalism degree from the University of Hawaii in 2020.   Even before that date, Mr. Ochs had been engaged in journalism by writing for websites and producing podcasts.   Most of Mr. Ochs' journalistic work involved writing for conservative websites and other organizations.   One of the platforms in which Mr. Ochs was involved was a Telegram page called "Murder the Media."    Mr. Ochs participated in "Murder the Media" with Mr. DeCarlo beginning in approximately 2018.    Though this Telegram channel focused primarily on conservative American political issues, the channel also poked fun at both sides of the political debates.   On about January 6, "Murder the Media" was an active social media platform and Mr. Ochs was an active correspondent.   Mr. Ochs also wrote a blog called the "Ochs Report" for many years.

It was in this capacity, as a correspondent for a conservative media outlet, that Mr. Ochs sought to travel to Washington and report on the events surrounding the certification of the presidential election on January 6.   Given that Mr. Ochs did not have the funds to travel to Washington, he published an online fundraising appeal seeking to raise the required money for his journalist venture.   Though Mr. Ochs was able to raise $350.00, this relatively modest sum was plainly insufficient to cover travel costs to and from Washington and Hawaii.   As such, to cover the shortfall, a person familiar with Mr. Ochs' work as a journalist donated the necessary reward travel points to allow Mr. Ochs to obtain an airline ticket.   At that time, DeCarlo and Mr. Ochs

intended to go to Washington for the January 6 rally and do street interviews of people at the rally.

At this point in time, Mr. Ochs had no intention of obstructing any proceeding whatsoever.



(Screen capture of Mr. Ochs online fundraising page).[1]

---

[1] Available at: https://www.givesendgo.com/GZ64

On the morning on January 6, Mr. Ochs and DeCarlo went to the rally where the President was addressing the crowd.  Mr. Ochs was dressed in normal civilian clothing and did not wear any special military or other riot gear—unlike the many others who attended the rally, dressed in military/assault garb, signaling their violent intentions.   Mr. Ochs was armed only with a smartphone.

Before attending the rally, Mr. Ochs did not communicate with any other Proud Boy members regarding their planned activities for the day.  Indeed, at no point during the rally or the resulting assault on the Capitol, did Mr. Ochs coordinate with other Proud Boy members.  As is stated in the Statement of Facts, though Mr. Ochs did come across other Proud Boy members in Washington, these were chance encounters and not the result of any prior planning.  During the rally itself, Mr. Ochs was unable to live stream the event because the local cellular system was overwhelmed, and given his physical location, he was unable to hear the president's speech.

At the conclusion of the rally, after the President finished speaking on the Ellipse, Mr. Ochs began seeking out the larger crowd which had begun moving towards the Capitol building—the first of many bad decisions that day.  When Mr. Ochs got close to the Capitol, he witnessed what was essentially a riot taking place, and proceeded to move forward with the crowd.  At some point, an unknown person gave Mr. Ochs a small smoke bomb about the size of a quarter.   Mr. Ochs took the small smoke bomb and tossed it towards a police line, believing that no harm could come to anyone by a quarter-sized device.   In fact, neither Mr. Ochs nor the government can definitively say the smoke bomb ever discharged.   Regardless, watching his actions on video now, and reflecting on his poor decisions, Mr. Ochs regrets and is deeply embarrassed by his juvenile behavior exhibited at the Capitol.

Afterward, Mr. Ochs continued to film the riot and surrounding events, eventually making his way into the Capitol.   Mr. Ochs was able to enter the Capitol through an open door, and once inside, was surprised to see that many windows had been broken or shattered.    Once entering the Capitol, Mr. Ochs essentially wandered the corridors and halls.

Mr. Ochs was in the Crypt of the Capitol at 2:26 when he stopped to smoke a cigarette. (SOF 14).   At 2:30, Mr. Ochs was filmed in the Crypt lobby where others sought to keep open what the government describes as "crash doors".  (SOF 16).   Though Mr. Ochs observed other rioters attempting to forcibly keep these doors open, he never participated in their efforts, nor physically touched the doors themselves.  Later, Mr. Ochs walked into the Capitol Visitors Center, the East Foyer, the Rotunda, and Statuary Hall.  (SOF 17).  It was in the East Foyer that Mr. Ochs had his chance encounter with other Proud Boy members, but their interactions were short and non-substantial.   After pointing out where Nancy Pelosi's office was, Mr. Ochs exited the Rotunda and the Capitol Building altogether.   (SOF 18).

Mr. Ochs was inside the Capitol for approximately 37 minutes.  During that time, it appears that he never spoke to a police officer other than the one he interacted with while he was leaving the Capitol to say he was leaving.   Importantly, during Mr. Ochs' time at the Capitol, he never assaulted or even touched another individual.   Unlike so many others that day, Mr. Ochs did not attempt to threaten others or steal meaningful property.   Though Mr. Ochs was present when DeCarlo scribbled on the door described in paragraph 19 of the Statement of Facts, he is immensely embarrassed by his encouragement and participation in the defacement of the Capitol—a shame that is forever memorialized on film for all to see.

The statements attributed to Mr. Ochs in Statement of Facts about "stopping the steal" are not in dispute.   Mr. Ochs has acknowledged by his plea that he acted corruptly to obstruct the

Electoral Count and that he is guilty of the charged offense.   Of course, Mr. Ochs was not alone in making statements about "stopping the steal."   Indeed, that sentiment – and those exact words – were repeated by thousands of people in and out of the Capitol that day including many in high Government offices.

Finally, the government's attempt to somehow cast Mr. Ochs as a leader of the January 6 riot is inappropriate and misleading.  In its Sentencing Memorandum, the government details a number of chat messages between various Proud Boys members in several messaging groups—of which Mr. Ochs was a member.  However, in none of these chat messages did Mr. Ochs occupy an active managerial role and was never informed of any plans to violate the law.  Indeed, though Mr. Tarrio invited Mr. Ochs to join the "Ministry of Self Defense" message group—along with approximately 50 other people—Mr. Ochs did not contribute to the group in any meaningful way, a point seemingly conceded by the government in its Sentencing Memorandum when it highlights the "chatter" from other members discussing details of the rally, but then states that the government *assumed* Mr. Ochs was closely following the group's plans because of his single message that he "can't wait" for the D.C. rally.  Dkt. 94, pg. 7.

Likewise, though the government relies extensively on a single message by Mr. Ochs, where he offhandedly referred to himself as a leader, Dkt. 94, pg. 9, and a tasteless message in which Mr. Ochs states he is "pro-violence," *id*., at 4, the government is unable to point to a single actual instance wherein Mr. Ochs actually performed the duties of a leader or acted out in violence during the January 6th riots.[2]  Instead, the government can only point to Mr. Ochs juvenile behavior in throwing a smoke device in a crowd, the filming of his co-defendant scribbling on a wooden

---

[2]  The Government does not identify a single act of violence committed by Mr. Ochs in his entire life which is why it relies on one written word to seek to show unsupported propensity for violence.  There was much violence perpetrated on January 6 but none by Mr. Ochs.

door, smoking a cigarette in the Crypt, "enjoy[ing] a fellow rioter's efforts to jam open crash doors[,]" and motioning towards an exit while at the same time yelling "Nancy's office" as evidence of his "aggravating conduct" justifying a "significant term of incarceration." *Id.*, at 35.[3] Moreover, unlike so many others that day, Mr. Ochs never went into the House of Representatives or onto the floor of the Senate.

To be sure, Mr. Ochs' conduct while at the Capitol was serious and worthy of punishment. However, for the reasons stated below, a sentence of no more than 18 months imprisonment, with a prolonged period of probation and a pecuniary fine is commensurate with the conduct that Mr. Ochs actually exhibited while at the Capitol on January 6th.

## II.     A Sufficient Sentence Under 18 U.S.C. § 3553(a)

Since *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court has required district courts to consider <u>both</u> the Sentencing Guideline range and the sentencing factors set out in 18 U.S.C. § 3553(a) when determining a criminal defendant's ultimate sentence.  As such, sentencing courts are instructed to first correctly calculate the Guideline range for a given defendant, then consider the § 3553(a) factors to determine whether a sentence within the Guideline range is appropriate or whether a departure or variance from the Guidelines is warranted.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Indeed, by enacting 18 U.S.C. § 3553 Congress has *directed* that federal courts "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing

---

[3] The Government proffers no evidence that anyone followed Mr. Och's supposed directions and went to Speaker Pelosi's office.

based on the statutory factors laid out in the statute.[4]  Indeed, the Supreme Court has held that sentencing courts are required to "consider what sentence is appropriate for *the individual defendant* in light of the [§ 3553(a)] sentencing factors," *Nelson*, 555 U.S. at 351 (emphasis added), to ensure that the punishment imposed in a particular case "fit the offender and not merely the crime[.]" *Williams v. New York*, 337 U.S. 241, 247 (1949); see also *Spears v. United States*, 555 U.S. 261 (2009) (explaining that the Sentencing Guidelines cannot be used as a substitute for a court's independent determination of a just sentence based upon consideration of the statutory sentencing factors).

As such, consistent with both Congress' and the Supreme Court's direction here, a sentence of no more than 18 months imprisonment is warranted in this case.

### a.  Nicholas R. Ochs's History and Personal Characteristics

The Presentence Report contains a comprehensive and discerning recitation of Mr. Ochs' personal history, family circumstances, and work history from which the Court can glean his modest background and love of family, work, and service as a former, and partially disabled, United States Marine.

Mr. Ochs, currently 36 years old, was born to two loving and devoted parents—his mother, a now-retired dental hygienist, and his father, a former United States Marine who passed away in 2010 from melanoma cancer and whose death plainly was a traumatic event in his life.  PSR, ¶68. Growing up with his two younger brothers, Mr. Ochs benefited from a warm and supportive family

---

[4] Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a).

environment.  Though his family moved often due to the military requirements of his father, by any standard of measurement Mr. Ochs had a very "pleasant childhood."  PSR, ¶70.

In 2011, Mr. Ochs joined the United States Marine Corps and served honorably until his discharge in 2015.  While in the Corps, Mr. Ochs distinguished himself by obtaining a number of good conduct ribbons, served as an Infantry Assault Man, and obtained the rank of E4 at the time of his retirement.  PSR ¶85.  In fact, Mr. Ochs' family has a long history of military service to this country, both his brothers and father also served in the Marine Corps until their retirement to successful civilian lives.  Unfortunately, because of his service, Mr. Ochs currently suffers from spinal arthritis and hearing loss in his right ear—which requires the use of a hearing aid to correct.  Because of these lifelong afflictions, Mr. Ochs has been given a disability rating of 30% and receives military disability benefits.  PSR ¶77.

While still in the Marine Corps, Mr. Ochs met the woman who would eventually become his wife.  Mr. Ochs and his wife married in June 2013 and had their first child—who is currently two years old.  PSR ¶71.  At present, Mr. Ochs and his wife are expecting their second child, whose' delivery date is May 2023.  *Id.*  Mrs. Ochs has written the Court a touching letter seeking mercy for her husband and has provided a beautiful family photograph.

As the presentence report makes clear, Mr. Ochs comes from a modest background and his young family does not enjoy significant financial resources.  *See* PSR ¶94 ("Based upon the [Mr. Ochs'] financial profile, it does not appear he has [the] resource[s] to pay a fine in addition to his restitution obligation.").  Currently, Mr. Ochs and his wife are "upside down" on their Florida home—owing roughly $63,000 on a home that has a fair market value of $45,966.  PSR ¶93. Moreover, at present, Mr. Ochs and his family use the government food stamps program as a partial means of feeding their family.  As such, a prolonged period of incarceration where Ms. Ochs is

not earning a wage will prove to be a great determinant to his wife, two-year son, and soon-to-be-born child—who in all likelihood will be delivered while Ms. Ochs is still incarcerated.

As born out in the letters submitted to this Court from family members and friends, Mr. Ochs possesses a strong work ethic and a serious sense of commitment to his community, especially his fellow Marines, and family.   Mr. Ochs' mother writes to tell the Court that her son was deeply impacted by the early death of his father and that this loss contributed to the bad decisions he made on January 6: "The irreplaceable loss of his father's influence has put nick at risk and no doubt played a role in his lapse of judgment on Jan 6."  She notes, however, that high levels of empathy are part of her son's character and offers the Court a mother's promise that she will make her son "dive deep into an understanding of inherent personality traits that contributed to a felony conviction."  Separately, Mr. Ochs' wife writes that her husband is a "decent man who made a mistake" and just wants to help the family.  She asks the Court for mercy as a mother of one young child and another on the way.  She tells the Court that she is fighting MS while raising these young children and asks that Mr. Ochs be allowed to return home as soon as possible to assist in the raising of their children—she also has included a beautiful family photo with her submission to the Court.  Additionally, Mr. Ochs' fellow marines have also written letters in support of their former comrade, and as made all too clear by these letters, Mr. Ochs served his country with distinction.  *See* letters from Patrick Musser, Michael Trejo, and John Tierney.  Finally, the Court is provided a letter from Captain Jeff Shoup, USMC, who writes that he has known Mr. Ochs since high school and highlights for the Court the profound impact of the loss of Mr. Ochs' father had on "Nick," and that Mr. Ochs responded by joining the Marine Corps like his dad and brothers.

While his brief foray into the Capitol and his presence on the Capitol grounds cannot be condoned, Mr. Ochs's service to this country, and a lifetime of lawful behavior, gives this Court

no reason to suspect that his conduct on January 6th was anything other than an aberrant lapse of judgment in the midst of an unprecedented political maelstrom.

### b. *Seriousness of the Offense, Respect for the Law, Just Punishment, Deterrence and Protection of the Public*

Mr. Ochs stands before this Court as a first-time criminal offender, and now convicted felon. Despite the government's argument to the contrary, Mr. Ochs has accepted responsibility for his role in the January 6th riot by pleadings guilty to a felony, a conviction which will follow him for the remainder of his life. Moreover, he has established a good track record while on pre-trial release and possesses a demonstrated history of lawful behavior. Simply put, Mr. Ochs has given this Court no reason to doubt that he will faithfully comply with the law in the future and no reason to fear that he will suffer a similar failure in judgment again.

Here, considering the sum total of Mr. Ochs' actions in connection with the January 6 riot, demonstrates that a lengthy period of incarceration is not warranted. As previously stated, on January 6, 2021, Mr. Ochs attended the President's "Stop the Steal" rally, after which he proceeded, along with hundreds of others, to the United States Capitol building. After encountering police near the inauguration scaffolding and tossing a harmless smoke bomb, Mr. Ochs, and his companion DeCarlo proceeded to enter the Capitol. Once inside, Mr. Ochs and DeCarlo meandered through the Capitol; taking pictures of themselves smoking a cigarette, talking with fellow rioters, drawing on a wooden door with a marker, and picking up a pair of disposable flexcuffs—which he immediately dropped before departing the Capitol. The government has previously admitted that Ms. Ochs' actions on January 6 were not demonstrative of seditious conduct and concedes that no one was physically hurt as a result of his behavior.

The aforementioned conduct was ill-advised, reckless, and often just foolish. However, Mr. Ochs' conduct, through criminal, was non-violent and resulted in no physical injuries. Indeed,

besides participating in drawing on a wooden door with a marker, Mr. Ochs' conduct left no lasting injury on anyone or anything.   The Court can inquire of the Government how much money was spent to repair the door.   That number has been designated "confidential" but is *de minimis*.

As the government has often repeated, "the violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."   *See* FBI Director Wray Statement before the House Oversight and Reform Committee, EXAMINING THE JANUARY 6 ATTACK ON THE U.S. CAPITOL (June 15, 2021).[5]   Nevertheless, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings...."   *Gall v. United States*, 552 U.S. 38, 52 (2007).   As further discussed below, the damage Mr. Ochs caused is in-line with others at the lowest end of the spectrum who have received short prison sentences, for the same essential offense.  For this reason, a sentence of no more than 18 months imprisonment is all that is necessary to deter crime generally and to protect the public from further crimes by Mr. Ochs.  See 18 U.S.C. § 3553(a)(2)(B) and (C); *United States v. Russell,* 600 F.3d 631, 637 (D.C. Cir. 2010) ("Subsections 3553(a)(2)(B) and (C) codify the penal goals of general and specific deterrence, requiring disincentives to match the severity of punishment to the harmfulness of the crime.").

Despite the division that exists across the country, sending Mr. Ochs to prison for a lengthy period of time is not an effective way to achieve the goal of general deterrence.  According to the National Institute of Justice, "the certainty of being caught is a vastly more powerful deterrent than the punishment."  U.S. Department of Justice, Office of Justice Programs, National Institute of

---

[5] Available at: https://www.fbi.gov/news/testimony/examining-the-january-6-attack-on-the-us-capitol-wray-061521

Justice, *Five Things about Deterrence*, May 2016.[6]  Research has found evidence that prison can exacerbate, not reduce, recidivism:

> "… compared to non-custodial sanctions, incarceration has a null or mildly criminogenic impact on future criminal involvement. We caution that this assessment is not sufficiently firm to guide policy, with the exception that it calls into question wild claims that imprisonment has strong specific deterrent effects."

*Id*., at 2.

Indeed, *any prison* sentence for *a first-time* criminal offender, as is the case with Mr. Ochs, is a significant punishment.  The realities of incarceration, along with the lifetime classification as a felon, is sufficient but not greater than necessary to both deter Mr. Ochs from further criminal conduct and work as a general deterrent to the public at large.

### c.   The Need to Avoid Unnecessary Sentencing Disparities

As part of the Court's calculus in arriving at an appropriate sentence, the need to avoid unwarranted sentence disparities among similarly situated defendants is an important and statutorily mandated factor that any sentencing court must consider in arriving at its ultimate sentencing decision.  *See* 18 U.S.C. § 3553(a)(6).  Considering the sentences received by other §1512(c) convicts, a sentence of no more than 18 months imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing.

Since November 3, 2022, roughly sixteen defendants have been sentenced for 18 U.S.C. §1512(c) offenses.  However, most of these defendants also had additional companion charges along with their §1512 offense including assault on police officers.[7]  In examining the sentences and conduct of five defendants that were only convicted of an §1512(c) offense, it is clear that Mr. Ochs' sentencing recommendation is more than reasonable.

---

[6] Available at: https://www.ojp.gov/pdffiles1/nij/247350.pdf
[7] Information obtained from the government's sentencing table filed in *United States v. Ashlock*, 1:21-cr-00160-6 (Dkt. 169-1).

In *United States v. Hodgkins*, 1:21-cr-188, the Court sentenced the defendant to 8 months incarceration (despite the government's request for 18 months of incarceration) followed by 2 years supervised release and ordered the defendant to pay $2,000 in restitution.   There, the defendant engaged in the following conduct:

- On January 6, 2021, at approximately 2:50 p.m., the defendant entered the U.S. Capitol Building, and at approximately 3:00 p.m., he entered the senate chamber and walked among the desks on the Senate floor, taking photographs of himself on the chamber floor.

- Defendant than walked down to the Senate well, where he positioned himself next to the president pro tempore's desk.   While holding a Trump campaign flag, he stood next to others who had begun shouting, praying, and commanding the attention of others in the Senate chamber.

- The defendant remained in the Capitol building until roughly 3:15 p.m.

*Id.*, Dkt. 23, pp 3-4 (Statement of Offense).

In *United States v. Michetti*, 1:21-cr-232, the Court sentenced the defendant to 9 months of incarceration (despite the government's request for 18 months of incarceration), 24 months of supervised release, and ordered the defendant to pay $2,000 in restitution.   There, the defendant engaged in the following conduct:

- On January 6, 2021, at approximately 2:06 p.m., after attending the president's "Stop the Steal" rally, the defendant walked to the Capitol building while texting another individual "...it's going down here we stormed the building they held us back with spray and teargas and paintballs."

- The defendant entered the Upper West Terrace Door with other rioters at approximately 2:35 p.m., minutes after the door was initially breached.   At approximately 2:44 p.m., on January 6, 2021, the defendant sent two videos to another individual from his telephone, showing rioters inside the U.S. Capitol Building.

- Defendant was then in a crowd of people at about 2:44 p.m. trying to get past a police line of Metropolitan Police Officers in the hallway by the Old Senate Chamber.   He remained near the front of the crowd, yelling at the police "we feed your family"; "you are just taking orders"; and "we pay you".   He gesticulated at the officers and at one point briefly pinched the sleeve of one officer as the officers were trying to do their lawful duty and keep the mob from penetrating further into the building.

- The defendant then went into the inner entry area by East Rotunda doors, where he faced a U.S. Capitol Police bicycle officer and yelled and gesticulated toward the officer. He continued inside to the inner door to the Rotunda at about 3:12 p.m., again pushing with the mob against a police line there. The defendant left the Capitol grounds at approximately 5:26 p.m

*Id*., Dkt. 41, pp. 3-5 (Statement of Offense).

Mr. Ochs' conduct while in and at the Capitol building was similarly subdued. As previously stated, Mr. Ochs was not the leader or organizer of any of the rioting groups on January 6th, like some of the defendants listed below. Though Mr. Ochs was the founder of his local Proud Boys chapter, the government has produced no actual evidence, besides passive membership in chat groups, that Mr. Ochs played a leadership role on January 6th—or in the days leading up to the same. Indeed, the government's attempt to cast Mr. Ochs as a supposed leader in the riots is plainly contradicted by its later characterization of Mr. Ochs' as "playing the role of an *appreciative audience* and by acting like the breach was an opportunity for hijinks and laughs." Dkt. 94, at 37 (emphasis added). While the government attempts to argue that in his role as an audience member, Mr. Ochs "emboldened those around [him]," *id*., it offers no evidence to support its conjecture.

44Moreover, unlike the other defendants detailed below, Mr. Ochs did not engage violently with the police, or hurl objects through windows and doors. Instead, Mr. Ochs' single act of vandalism involved simply watching DeCarlo scribbling on a door with a marker, and his encounter with police involved a harmless smoke device. To be clear, Mr. Ochs' conduct on January 6 was criminal, inexcusable, and unjustified. However, the conduct Mr. Ochs exhibited was markedly different from defendants Chansley, Pruitt, and Secor—whose cases are briefly summarized below.

In *United States v. Chansley*, 1:21-cr-003, the Court sentenced the defendant to 41 months of incarceration, followed by 36 months supervised release, and ordered defendant to pay $2,000 restitution.   The defendant, also known as the "QAnon Shaman," engaged in the following conduct:

- On January 6, 2021, dressed in a horned viking hat, shirtless, and adorned in war paint, the defendant approached the Capitol building and climbed a media tower that had been erected for the inauguration.  The defendant, and others, pushed past the police line at the top of the Upper West Terrace of the Capitol and entered the building at roughly 2:00 p.m.

- Indeed, the defendant was with the mob that approached the first floor of the Capitol building on the Senate side.  Members of this crown broke two windows and broke open the doors to the Capitol building—the defendant then entered through the broken doors at 2:14 p.m.

- At 2:16 p.m. the defendant, along with others, ascended the stairs to the second floor to the Senate side of the building where he was met by a line of U.S. Capitol Police officers.  The defendant challenged the officers to let the crowd pass—using a bullhorn to provoke the crowd and demand that the lawmakers inside be brought out.

- At approximately 2:52 p.m., the defendant broke into the Gallery of the Senate chamber, alone, wherein he screamed obscenities—provoking the flood of rioters into the Chamber below.

- Defendant then scaled the Senate dais, taking the seat Vice President Pence had occupied less than an hour before.  Once at the dais, the defendant took pictures of himself occupying the seat, refused lawful orders to vacate, and beckoned other rioters up to the dais—leading them in an incantation over the bullhorn he had brought into the chamber.

- In the days following the riots, the defendant gave multiple interviews with media outlets calling the lawmakers who had taken shelter inside the Capitol during the siege "traitors" and considered the entire January 6 riot a "win"

*Id.*, Dkt. 70, pp 3-6 (Statement of Offense).

In *United States v. Pruitt*, 1:21-cr-023, the Court sentenced the defendant to 55 months in prison, three years of supervised release, and $2,000 restitution.  The defendant engaged in the following conduct:

- On the morning of January 6, 2021, the defendant posed for pictures holding what appeared to be a rifle—posting the same on social media.  In fact in response to a text

message from another individual stating: "I hope Trump declares war. It doesn't look good for the Republic…" the defendant responded by sending a photograph of himself holding a rifle.

- At 2:10 p.m. on January 6, 2021, the defendant was on the Northwest Lawn of the Capitol; wearing a tactical glove with knuckle pads.  By 2:14 p.m. defendant was inside the capitol building, outside the Old Supreme Court—while there he picked up a wooden sign and threw it violently.

- At some point the defendant entered the Crypt, where he and other rioters overwhelmed a line of police and pursued them in their retreat.  While pursuing the officers, the defendant picked up a chair and threw it at the retreating police officers.  During the defendant's time inside the capitol, he also came into contact with Senator Schumer's security detail.

- Later, the defendant would describe his time clashing with police as "fun" and bragged of his exploits on national news.

*Id.*, Dkt. 61, pp 3-6 (Statement of Offense).  Importantly, the defendant in *Pruitt* had a criminal history and participated in the aforementioned events while on pretrial release.  *See* Govt Memorandum on Sentencing, Ochs, pg. 45 (Dkt. 94).

In *United States v. Secor*, 1:21-cr-157, the Court sentenced the defendant to 42 months in prison, three years of supervised release, $2,000 restitution. The defendant engaged in the following conduct:

- Prior to the January 6 riots, the defendant engaged in an online campaign designed to sow discord and promote violent action, by implication, to stope the certification of the then-recent presidential election by violence.  Specifically, in November 2020 the defendant wrote in a text message that "We're gonna win bigly and if we don't we're taking this ship down in flames." Later, the defendant tweeted "They are stealing the election.  If we allow them to, we deserve to live under their tyranny. What will you do, little man? Will you take it, accept it, kneel?"

- The day before the riots, on January 5, 2021, the defendant messaged another individual that he had brought a gas mask with him to D.C. because he was expecting things to "go sideways[,]" and that he "Wouldn't be surprised if conservatives just storm the police and clobber antifa and the police but that's wishful thinking."

- At approximately 2:26 p.m. the defendant entered the Capitol building and proceed to make his way through the Crypt, the house side of the building, and into the Speaker of the House, Nancy Pelosi's office.

- Around 2:38 p.m. the defendant helped a group of rioters inside the Capitol force open the East Rotunda doors, which were being guarded by three Capitol Police officers. "The group of approximately 25 rioters threw their weight against the doors, which the defendant joined by bracing his body against the backs of other rioters as they pushed. In the process, the crowd trapped the three Capitol Police officers against the doors. The rioters ultimately overpowered the officers, and the defendant and fellow rioters assisted those on the outside of the Capitol [to] enter [by force.]"

- The defendant entered the Senate Floor around 2:49 p.m., wherein he made his way to the Senate Dais and sat in the seat that had been previously occupied by Vice President Pence less than an hour before.  Defendant left the Capitol building at approximately 2:51 p.m.

*Id*. Dkt. 43, pp. 3-6 (Statement of Offense).

Indeed, Mr. Ochs' sentencing recommendation is all the more reasonable when considered in light of the sentence handed down in *United States v. Thompson*, 1:21-cr-461.  There the defendant plead guilty to one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b).  The Court sentenced the defendant to 46 months in prison, to be followed by 36 months of supervised release, and $2,000 in restitution.  The defendant's conduct was both horrific and disturbing:

"Thompson[]was among individuals in a crowd on the Lower West Terrace of the Capitol who were pushing against and assaulting Metropolitan Police Department (MPD) and U.S. Capitol Police (USCP) officers in the tunnel leading into the U.S. Capitol… Thompson was part of a group that threw objects and projectiles at the officers, including flag poles, and grabbed and stole the officers' riot shields to prevent them from defending themselves against the violence.

 At approximately 2:21 p.m., Thompson personally observed police order rioters to stop, physically push the crowd back, and deploy pepper spray in an effort to try to stop the ongoing assault. Later, Thompson entered a tunnel on the West Front Terrace that led to an entrance to the U.S. Capitol, where members of Congress were sheltering in place.  Thompson joined rioters in that tunnel and assisted other rioters in their assault of officers by helping them seize and use stolen law enforcement shields for approximately 13 minutes.  Thompson also helped throw a large speaker at the front line of officers, and he later picked up a metal baton from the floor of the tunnel and swung it overhead and downward against the police line in an apparent effort to knock a can of pepper spray from an officer's hand and stop the officer from pepper-spraying the rioters."

Dept of Justice, Press Release, *Seattle Man Sentenced to 46 Months in Prison for Assaulting Law Enforcement During Capitol Breach* (12/20/2021).[8]

It is important to note here, that despite Mr. Ochs' relatively minor role in the January 6 riot, his probation officer has recommended a sentence of 41 months—the low end of Mr. Ochs' guideline range—a mere 5-month difference to the defendant in *Thompson*, an individual who violently clashed with police while also stealing one of their only means of protection (their police riot shields). See PSR ¶96. The defendant in *Thompson* actively put officers in harm's way, Mr. Ochs scribbled on a wooden door and tossed a small smoke device towards the police—a device that there is no proof ever detonated, and never harmed anyone. Respectively, likening Mr. Ochs' conduct to that of the violent individual exhibited in the *Thompson* case would create unwarranted sentence disparities and would blur the lines between both the minor and major offenders on January 6.

Again, although Mr. Ochs' conduct at the Capitol was criminal and inexcusable, his behavior was non-violent, and his modest act of vandalism did not cause lasting damage. To avoid unwarranted disparities, this Court should not lump Mr. Ochs' conduct in with some of the more serious offenders, but instead should consider Mr. Ochs' relatively minor role and sentence him accordingly.

## CONCLUSION

As such, for the aforementioned reasons, Mr. Ochs respectfully requests that this Court impose a sentence of no more than 18 months imprisonment, with a prolonged period of probation and a pecuniary fine. Mr. Ochs also requests credit for time served as well as a judicial recommendation to a facility where he can take classes under the First Step Act and be near his

---

[8] Available at: https://www.justice.gov/usao-dc/pr/seattle-man-sentenced-46-months-prison-assaulting-law-enforcement-during-capitol-breach

wife and family.   Specifically, Mr. Ochs requests FPC Pensacola so that he can stay in touch with his family while he pays his debt to society.

Such a sentence would protect the community, promote respect for the law, and deter future crime by imposing consequences for My Ochs' behavior while recognizing his acceptance of responsibility and his role in the offense.   It would also achieve a degree of uniformity in the sentences imposed.

Respectfully submitted,

NICHOLAS R. OCHS
By Counsel

_____/s/_____
Edward B. MacMahon, Jr., VSB # 25432
LAW OFFICES OF EDWARD B. MACMAHON, JR.
P.O. Box 25
107 East Washington Street
Middleburg, VA 20188
(540) 687-3902 (T)
ebmjr@macmahon-law.com

**CERTIFICATE OF SERVICE**

I hereby certify on this 29th day of November, 2022, a true and accurate of the foregoing was served on all counsel of record via the Court's Electronic Filing System.  I further certify that a copy was also sent by e-mail to Sherry Baker, Probation Officer, at sherry_baker@dcp.uscourts.gov.

_____/s/_____
Edward B. MacMahon, Esq.