**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES | |
| v. | Criminal Action No. 21-073-02 (BAH) |
| NICHOLAS R. OCHS, | Judge Beryl A. Howell |
| Defendant. | |

**MEMORANDUM OPINION**

Pending before the Court is a motion filed by Nicholas R. Ochs seeking a refund of the fractional amount he has paid towards the amount he owed in restitution, criminal fine and a special assessment in connection with his felony conviction, prior to receiving a pardon from the current President.  Def.'s Unopposed Mot. Return of Restitution, Fines & Fees ("Def.'s Mot."), ECF No. 135.  In September 2022, Ochs, a senior member and founder of the Hawaii chapter of the Proud Boys, pleaded guilty to Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2), for his criminal conduct as part of the January 6, 2021, attack on the United States Capitol on the day that Congress was constitutionally and statutorily mandated to certify the results of the 2020 presidential election.  Statement of Offense of Nicholas Ochs ("SOF") ¶¶ 3, 8, 24, ECF No. 82 (signed "voluntarily and of my own free will" by "Nicholas R. Ochs," after acknowledging that he had read and discussed the SOF with his attorney and agreed "that this [SOF] is true and accurate.").  Ochs admitted that his offense conduct included stealing equipment from law enforcement officers, defacing the Capitol Building, and throwing smoke bombs at law enforcement officers who were trying to protect elected officials, their staff, and others in the Capitol building, and that he was motivated by his belief that the 2020 election was stolen, stating in a video he recorded that day, " . . . the steal is for now stopped.  You're welcome, America!"

1

*Id.* ¶¶ 10, 13, 18-20, 23-24; Plea Hr'g Tr. (Sept. 9, 2022) at 28:18-21, 29:16-18, 33:15-34:3, 34:24-25, ECF No. 116.

Of course, no evidence has ever been substantiated that any outcome determinative election fraud occurred in the 2020 presidential election. *See, e.g.*, Press Release, Dep't of Homeland Sec., Joint Statement from Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees (Nov. 12, 2020), https://perma.cc/C3AL-ALBC ("The November 3rd election was the most secure in American history. . . . There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised. . . . While we know there are many unfounded claims and opportunities for misinformation about the process of our elections . . . we have the utmost confidence in the security and integrity of our elections, and you should too."); Final Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol, H.R. Doc. No. 117-663, at 390 (2d Sess. 2022) ("Senior DOJ officials—Barr, Rosen and Donoghue—had repeatedly stated the opposite. They found no evidence of fraud that would have impacted the election's results—none."); *id.* at 377 (quoting Statement by U.S. Attorney General William Barr, December 1, 2020 ("To date, [Department of Justice investigators] have not seen fraud on a scale that could have effected a different outcome in the election."); *id.* at 19 ("Ultimately, even Rudolph Giuliani and his legal team acknowledged that they had no definitive evidence of election fraud sufficient to change the election outcome. For example, although Giuliani repeatedly had claimed in public that Dominion voting machines stole the election, he admitted during his Select Committee deposition that 'I do not think the machines stole the election.'"). Thus, Ochs' espoused belief about a stolen election that he says motivated his offense conduct was and remains incorrect. Notably, Ochs' co-defendant, who accompanied Ochs on January 6, 2021, tried to explain his own

parallel offense conduct, stating that he is a "gullible person . . . easy to upset and manipulate, and these things probably are what helped [him] get swept up so easily that day."  Letter from Ochs' Co-Defendant, Ex. 1 to Co-Def.'s Sent'g Mem., ECF No. 97-1.

No matter Ochs' motivation for his criminal conduct, the costs to the American taxpayer from the attack on the U.S. Capitol on January 6, 2021, were substantial.  This fact properly prompted the government to demand payment of restitution from defendants convicted of criminal conduct in the attack on the U.S. Capitol, with identified "victims includ[ing] the Architect of the Capitol (the federal agency responsible for the physical upkeep of the Capitol building and grounds), the House Chief Administrative Officer, the Secretary of the Senate, the Senate Sargent at Arms, and the United States Capitol Police Department ('USCP'), several hundred of whose officers were guarding the Capitol Building and Grounds on January 6 when they suffered physical and psychological injuries as a direct result of the riot[,]" and "[t]he Metropolitan Police Department ('MPD')[, which] also suffered losses as a result of January 6, 2021, and is a victim." Gov't's Submission Regarding Restitution at 1 & 1 n.1, *United States v. Todd III*, No. 22-cr-166 (BAH), ECF No. 238.  The damages to the Capitol Building encompassed expenses for cleaning, repair, and performing conservation on sculptures, paintings, and furniture; removing graffiti; and conducting laboratory testing of potential biohazards left by those attacking the Capitol, including "pepper spray residue, counter-assault bear repellent residue, Sabre Red repellent residue, fire extinguisher residue, human blood, paint, and a [cigarette] butt," before the objects within the Senate could be repaired.  Letter from Gen. Couns. to the Sec'y, Off. of the Sec'y, U.S. Senate to U.S. Att'y's Off. at 2 (June 11, 2024), *United States v. Todd III*, No. 22-cr-166 (BAH), ECF No. 240-2.  The U.S. Capitol also sustained thousands of dollars in costs to replace stolen property and furniture "damaged beyond repair."  Letter from Acting Assistant Seargeant at Arms, Off. of the

3

Sergeant at Arms, U.S. Senate to U.S. Att'y's Off. at 4-5 (June 12, 2024), *United States v. Todd III*, No. 22-cr-166 (BAH), ECF No. 240-3.

At the time of Ochs' plea hearing, in September 2022, the property damage to the Capitol Building alone was estimated to be $2,734,783.14, Plea Hr'g Tr. at 39:14-17, but this damage estimate amount only increased by the time of sentencing, in December 2022, *see* Gov't's Sent'g Mem. for Nicholas R. Ochs ("Gov't's Ochs Sent'g Mem.") at 47, ECF No. 94 (estimating damages at $2,881,360.20). As of July 7, 2023, the estimated damages to the Capitol building and grounds and for certain costs to the U.S. Capitol police was estimated by the government to be $2,923,080.05. *See* Final Presentence Investigation Rep. ¶ 20, *United States v. Conemac*, No. 24-cr-462 (BAH), ECF No. 18; Final Presentence Investigation Rep. ¶ 21, *United States v. Williams*, No. 24-cr-209 (BAH), ECF No. 43; Final Presentence Investigation Rep. ¶ 29, *United States v. Weeks*, No. 24-cr-131 (BAH), ECF No. 41.[1] Even those estimated damages did not cover the damages resulting from the numerous bodily injuries on law enforcement officers, including U.S. Capitol Police and D.C Metropolitan Police Officers, inflicted by those participating in the attack on the U.S. Capitol on January 6, 2021. Additionally, this estimate "does not include overtime labor costs for the Capitol Building and Grounds team, nor costs incurred in other areas of the Capitol complex, [or] include project delays and installation of temporary security measures." Letter from Chief Sec. Off., Architect of the Capitol to U.S. Att'y's Off. (June 14, 2024), *United States v. Todd III*, No. 22-cr-166 (BAH), ECF No. 248-1. Indeed, the Government Accountability

---

[1] "As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05," which amount "reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ('MPD') also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) . . . [and] in consultation with individual MPD victim officers, the government has sought restitution on a case-by-case evaluation." Gov't's Sent'g Mem. at 1 n.1, *United States v. Weeks*, No. 24-cr-131 (BAH), ECF No. 43.

Office estimated in 2023 that the total cost of this attack on the Capitol, including "damage to the Capitol building and grounds, estimated costs borne by the Capitol Police, the District of Columbia, and federal agencies, and estimated costs to address security needs and investigations," resulted in "about $2.7 billion in estimated costs."  Gov't Accountability Off., GAO-23-106625, CAPITOL ATTACK: FEDERAL AGENCIES IDENTIFIED SOME THREATS, BUT DID NOT FULLY PROCESS AND SHARE INFORMATION PRIOR TO JANUARY 6, 2021, at 1 & n.2 (released Feb. 28, 2023; reissued with revisions on July 21, 2023).

Set against these significant damages costs due to the Capitol attack, and as part of Ochs' felony conviction, he was ordered to pay a $5,000 criminal fine, $2,000 in restitution, and a $100 assessment.  Judgment of Nicholas Ochs at 7, ECF No. 106; *see also* Sent'g Hr'g Tr. (Dec. 9, 2022) at 71:19-21, 73:12-21, ECF No. 110.

Eighteen months after Ochs was sentenced, the Supreme Court, in *Fischer v. United States*, 603 U.S. 480 (2024), limited application of defendant's statute of conviction.  At his request, *see* Def. DeCarlo & Ochs Mot. for Post-Conviction Relief, ECF No. 112, and over the government's opposition, *see* Gov't's Opp'n to Defs.' Mot. to Vacate Their Convictions Under 28 U.S.C. § 2255, ECF No. 121, Ochs' conviction was vacated, though this order was stayed, during which period Ochs was ordered released from prison, *United States v. DeCarlo*, No. 21-cr-73 (BAH), 2024 WL 4650993 (D.D.C. Nov. 1, 2024); *see* Minute Order (Nov. 26, 2024) (continuing stay until Jan. 10, 2025, at parties' joint request); Minute Order (Jan. 2, 2025) (granting the parties' motion to continue which also requested that the stay of vacatur be extended); *see* Joint Mot. to Continue at 2, ECF No. 127 ("The parties further respectfully request that this Court extend its stay of vacatur until the arraignment and status hearing.").  Five days after a superseding indictment was returned

and four days before the stay of vacatur would have lapsed, Ochs was granted a presidential pardon on January 20, 2021.

Ochs now moves for an order directing the government to return all fines, fees, and restitution payments that he paid. *See* Def.'s Mot. The government declines to oppose this motion. *Id.* at 1 ("Assistant United States Attorney [name redacted] has indicated that the government does not oppose this motion."). Information provided by this Court's Clerk's Office indicates that Ochs paid, in total, $1,569.93, comprised of the $100 special assessment and $1,469.93 in restitution, and that these funds have been deposited into accounts of the United States Treasury.

For the reasons explained below, the pending motion is denied.

## I.   BACKGROUND

The factual background and procedural history relevant to defendant's motion for return of funds are described below.

### A.   Factual Background

Ochs is the founder of the Hawaii chapter of the Proud Boys, rose through the Proud Boys' ranks to achieve the status of "Elder" within the organization, with his apparent pride in his association with this organization revealed by his tattoo saying "Proud Boys" on his right arm. SOF ¶ 8; Def.'s Final Presentence Investigation Report ("PSR") ¶ 75, ECF No. 91 (sealed).[2] On January 4, 2021, Ochs boarded a flight from Honolulu, Hawaii, and arrived in Washington, D.C., the next day. SOF ¶ 9.[3] He traveled to D.C. because, in his words, "the president asked and said it was gonna be wild and that people should wear body cameras." *Id.* ¶ 9. On January 6, 2021,

---

[2]   The PSR is filed under seal and unsealed to the limited extent that sealed content is referenced to explain the reasoning in this Memorandum Opinion. *See United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009).

[3]   "The Proud Boys describes itself as a 'pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists.'" SOF ¶ 8 n.1. Within Proud Boys, elders possess a senior role and are responsible for approving new chapters. *Id.* ¶ 8.

Ochs attended President Donald J. Trump's "Stop the Steal" rally and subsequently marched to the Capitol with other individuals attending the rally. *Id.* ¶ 10.

As Ochs approached the Capitol Building, he proclaimed that "the steal is in fact right here and we are going to stop it." *Id.* ¶ 11. His co-defendant, another member of the Proud Boys, added "this is where they are going to steal it. And they called on us. They called on us to stop it. We are putting an end to it. They said calling all patriots. And our MVPs. Our MVP VIPs. Nick Ochs and Dick NeCarlo. Live on the Scene. We're going to put the kibosh on this." *Id.* Ochs, cognizant that he was on restricted grounds, then stated that "we're not supposed to be here, this is beyond the fence" as he arrived at the West Front, where preparations were underway for the upcoming inauguration. *Id.* ¶ 12. Ochs and his co-defendant encountered a line of police officers, who were trying to keep the rioters away from the inaugural stage, and they responded by throwing smoke bombs at the police. *Id.* ¶ 13.

Inside the Capitol building, at about 1:00 p.m., a joint session of the United States Congress had convened to certify the vote count of the Electoral College of the 2020 Presidential Election as required by the Twelfth Amendment of the United States Constitution and the Electoral Count Act, 3 U.S.C. § 15. *Id.* ¶ 3. As the numbers of rioters swelled, U.S. Capitol Police officers attempted to keep the crowd away so that Congress could perform its constitutionally mandated duties. *Id.* ¶ 4. By 2:00 p.m., the rioters forced their way through the barricades and Capitol Police officers were forced to retreat as the crowd advanced to the exterior façade of the building. *Id.* ¶ 5.

At about 2:12 p.m., Ochs climbed the stairs to the Upper West Terrace of the Capitol. *Id.* ¶ 14. Around eight minutes later, the members of the House of Representatives and the Senate, including then-Vice President Michael R. Pence, evacuated the Chambers of both the House and

the Senate. *Id.* ¶ 7. The dangerous circumstances created by the rioters halted congressional functions. *Id.* At about 2:23 p.m., Ochs breached the Capitol Building through the Senate Wing Doors and entered the Crypt of the Capitol at 2:26 p.m. *Id.* ¶ 14. In this location within the Capitol building, Ochs decided to smoke a cigarette with his co-defendant and flaunt himself doing so, taking a picture and posting it to social media with the caption "Hello from the Capital lol," as well as sending the photograph to an encrypted chat of Proud Boys members. *Id.* ¶ 15. His co-defendant observed that Congress had gone into lockdown and alternatively shouted "Where's Nancy?" and "Where you at, Nancy?" referring to the then-Speaker of the House of Representatives Nancy Pelosi. *Id.*

From there, Ochs moved through the Crypt's East Lobby to the Capitol Visitor Center, where crash doors were closing as police attempted to block rioters' access from certain parts of the Capitol. *Id.* ¶ 16. Ochs and his co-defendant encouraged and recorded others' efforts to wedge the crash doors open with various objects to frustrate Capitol Police officers' attempts to secure the building. *Id.* Around 2:42 p.m., Ochs met and hugged other Proud Boys in the East Foyer before they went to the Rotunda together. *Id.* ¶ 17. Once in the Rotunda, Ochs and his co-defendant yelled "Nancy's Office!" and pointed rioters towards an exit from the Rotunda where a group of rioters began to gather. *Id.* ¶ 18.

Ochs left the Capitol Building through the Rotunda Doors at about 3:00 p.m. and approached the Chestnut-Gibson Memorial Door, where he recorded his co-defendant deface the door by writing "Murder the Media," the name of their social media channel, on it with permanent marker. *Id.* ¶ 19. Memorializing their work, Ochs and co-defendant posed in front of the door to take pictures. *Id.* While still near the door, Ochs and co-defendant rummaged through a U.S. Capitol police duffel bag, and co-defendant stole a pair of flexcuffs. *Id.* ¶ 20.

In a video he took while walking away from the Capitol building, Ochs proclaimed, "sorry we couldn't go live when we stormed the fuckin' U.S. Capitol and made Congress flee." *Id.* ¶ 22. In another video taken that same day, Ochs relayed "good news" that Congress stopped the vote and boasted that the rioters successfully completed their mission to "stop the steal." *Id.* ¶ 23. In a final statement, Ochs concluded his remarks about his contribution to the attack on the U.S. Capitol with "You're welcome, America!" *Id.* That night he "went on CNN" admitting to his participation in the riot although purporting to have been "acting as a professional journalist." Sent'g Hr'g Tr. at 65:2-5. The next day, on January 7, 2021, Ochs was arrested in Honolulu, Hawaii. PSR ¶ 16.

## B.     Procedural Background

Ochs pleaded guilty on September 9, 2022, to Count 2 of a six-count superseding indictment for Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2), and waived his right to appeal, except in limited circumstances. *See* Plea Hr'g Tr. at 15:19-16:10, 51:17-21; Plea Agreement of Nicholas Ochs ¶¶ 1, 10.C, ECF No. 81; Minute Entry (Sept. 9, 2022). At the subsequent sentencing hearing, on December 9, 2022, the government recommended that Ochs be sentenced to a term of imprisonment of 51 months and that he be ordered to pay a fine of $14,329, equivalent to the amount raised in the "Ochs Family Fund" online campaign, plus restitution of $2,000, and a $100 special assessment. Gov't's Ochs Sent'g Mem. at 48. Through the online campaign during the pendency of his criminal case, Ochs raised over $14,000 for himself, claiming that "he is being selectively prosecuted for being a political dissident" and denying that "it was his conduct, not his views" that resulted in his felony conviction. Sent'g Hr'g Tr. at 66:5-10; *see* Gov't's Ochs Sent'g Mem. at 48. He was sentenced, below the government's recommendation, to a 48-month term of imprisonment and ordered to pay a special assessment of $100, a restitution payment in the amount of $2,000 to the Architect of the Capitol, and, finally, a

9

criminal fine of $5,000. *See* Sent'g Hr'g Tr. at 71:13-21, 73:12-18; Judgment at 6; Gov't's Ochs Sent'g Mem. at 48.

Following his sentencing, in the period between March 9, 2023, and October 9, 2024, Ochs paid a total of only $1,569.93 towards his financial obligations. The first $100 was apportioned to the special assessment and was immediately deposited into the Crime Victims Fund, an account within the United States Treasury, as is required by statute. *See* 34 U.S.C. § 20101 (requiring that "all fines that are collected from persons convicted of offenses against the United States" with some enumerated exceptions "shall be deposited in the [Crime Victims] Fund"). The remaining $1,469.93 was applied towards Ochs' $2,000 restitution obligation and was disbursed to the Architect of the Capitol.[4] When Ochs made his last payment, on October 9, 2024, he had an outstanding balance due of $530.07 in restitution and the entire $5,000 criminal fine.

In June 2024, the Supreme Court decided *Fischer v. United States*, 603 U.S. 480 (2024), which narrowed application of 18 U.S.C. § 1512(c)(2). In light of this decision, Ochs filed a habeas petition, pursuant to 28 U.S.C. § 2255, to vacate his conviction, which petition was granted, over the government opposition. *DeCarlo*, 2024 WL 4650993, at *1. The order vacating Ochs' conviction was initially "subject to a 30-day stay," during which period he was ordered released on the same conditions as his pre-sentence release. *Id.* At the parties' request, this stay of vacatur was extended until January 24, 2025. *See* Minute Orders (Nov. 26, 2024; Jan. 2, 2025); Joint Status Report at 2, ECF No. 126 ("The parties further respectfully request that this Court extend its stay of vacatur until the status hearing."); Joint Mot. to Continue Status Conference at 2, ECF

---

[4]    The Architect of the Capitol is the official in charge of the congressional agency tasked, among other responsibilities, with "the care and superintendence of the Capitol," such as "to clean and keep in proper order the exterior of the Capitol," and to direct and supervise "[a]ll improvements, alterations, additions, and repairs of the Capitol Building." 2 U.S.C. §§ 1812, 1813, 1814.

No. 127 ("The parties further respectfully request that this Court extend its stay of vacatur until the arraignment and status hearing.").

On January 15, 2025, the government filed a Second Superseding Indictment, charging Ochs with eight counts, including six felony charges: Conspiracy to Prevent an Officer from Discharging Any Duties, in violation of 18 U.S.C. § 372; Assaulting, Resisting, or Impeding Certain Officers using a deadly and dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. § 231(a)(3), 2; Destruction of Government Property, in violation of 18 U.S.C. §§ 1361, 2; Theft of Government Property, in violation of 18 U.S.C. §§ 641, 2; Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1), (b)(1)(A); Disorderly and Disruptive Conduct in a Restricted Buildings or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2), (b)(1)(A); Act of Physical Violence in a Restricted Buildings or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4), (b)(1)(A). Second Superseding Indictment, ECF No. 131. Only days before Ochs was scheduled to be arraigned on the new criminal charges, the government moved, on January 21, 2025, under Federal Rule of Criminal Procedure 48(a), to dismiss the Second Superseding Indictment, with prejudice, *see* Gov't's Mot. to Dismiss, ECF No. 133, due to newly-elected President Trump's executive order granting "a full, complete and unconditional pardon to all other individuals convicted of offenses related to events that occurred at or near the United States Capitol on January 6, 2021," Proclamation No. 10887, 90 Fed. Reg. 8331, 8331 (Jan. 20, 2025). The next day, this Court granted the government's motion to dismiss without prejudice, finding that dismissal with prejudice would be "improper" due to "defendants' own admissions of criminal conduct, including throwing smoke bombs at law enforcement officers who were trying valiantly to prevent rioters

11

from entering the Capitol Building, [which] provides ample basis for criminal prosecution." *United States v. DeCarlo*, No. 21-cr-073 (BAH), 2025 WL 266308, at *3 (D.D.C. Jan. 22, 2025).

Ochs now, without opposition or any filing from the government, "requests that the Court order the government and/or the Clerk of Court to refund his payments of $1400 in restitution, fines, and special assessments." Def.'s Mot. at 4. This motion is now ripe for resolution.

## II.    DISCUSSION

Ochs' pending motion seeks a relatively small amount of money, certainly compared to the millions of dollars—or billions of dollars, according to the Government Accountability Office— in property and other damages caused by the rioters, like defendant, participating *en masse* in the Capitol attack, though those damages are largely left to be paid by U.S. taxpayers. Yet, despite the small amount of money at stake here, this motion raises a legal issue of constitutional dimension. The U.S. Constitution sets up "a tripartite allocation of power," *Flast v. Cohen*, 392 U.S. 83, 95 (1968), under which "[e]ach branch 'exercise[s] . . . the powers appropriate to its own department,' and no branch can 'encroach upon the powers confided to the others,'" *Patchak v. Zinke*, 583 U.S. 244, 250 (2018) (first alteration added) (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 191 (1881)). "This system prevents '[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands'—an accumulation that would pose an inherent 'threat to liberty.'" *Id.* (quoting The Federalist No. 47, at 301 (Clinton Rossiter ed., 1961) (James Madison), and *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring)). For instance, as already discussed above, the Twelfth Amendment obliges the legislative branch to certify the results of the presidential election. Relevant here, the Appropriations Clause vests the power of the purse exclusively in Congress, commanding that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

James Madison argued that "[t]his power over the purse, may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." The Federalist No. 58, at 359 (James Madison). The D.C. Circuit has observed that "[t]he power over the purse was one of the most important authorities allocated to Congress," and thus the Appropriations Clause serves as "a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012). Unlike the other branches, the judiciary "has no influence over either the sword or the purse." The Federalist No. 78, at 465 (Alexander Hamilton).

Despite these fundamental governing principles and without citation to any statutory authority and relying on the government's acquiescence, Ochs requests that the Court grant his request for return of the $100 he paid as a special assessment and $1,469.93 he paid towards restitution. This amounts to seeking an order issued to either the Executive branch or the Congress, both co-equal branches of the federal government, to return to him those funds he has paid or to disburse funds, respectively. The motion provides no hint as to why sovereign immunity does not preclude either result, and the government's silence does not help to illuminate this stark issue.

Instead, Ochs points to *Nelson v. Colorado*, 581 U.S. 128 (2017), which held that a State statutory scheme requiring that "a defendant must prove her innocence by clear and convincing evidence to obtain the refund of costs, fees, and restitution paid pursuant to an invalid conviction. . . . does not comport with due process," *id.* at 134, as controlling resolution of this motion. *See* Def.'s Mot. at 2-4. Unlike the state statutory scheme for providing "refunds" to previously convicted defendants that was found lacking in *Nelson*, no analogous federal statute or procedure is cited as governing Ochs' motion. Absent a federal-level scheme for such refunds,

13

Ochs' request boils down to asking this Court simply to follow the government and turn a blind eye to the legal obstacles posed.

Analysis of this motion consists of three parts: first, review of the longstanding Supreme Court precedent that, for more than a century and a half, has limited the authority of courts to remove funds vested in the U.S. Treasury; second, examination of *Nelson*'s reasoning and consideration of whether its holding displaces that longstanding precedent; and finally, upon determining that this precedent remains controlling, finding no alternate, plausible sources of statutory authority by which Ochs may claim entitlement to a refund of his fractionally paid criminal restitution and special assessment.

## A.    Longstanding Supreme Court Precedent Establishes That Funds Deposited in the U.S. Treasury Cannot Be Returned Absent Congressional Authority

January 6, 2021, was not the first time that a domestic group upset about the results of a presidential election sought to stop the processes of a lawfully elected federal government. Following another such effort, President Andrew Johnson issued, on December 25, 1868, Proclamation No. 179, which "proclaim[ed] and declare[d] unconditionally, and without reservation, to all and to every person who directly or indirectly participated in the late insurrection or rebellion, a full pardon and amnesty for the offense of treason against the United States, or of adhering to their enemies during the late civil war, with restoration of all rights, privileges, and immunities under the Constitution and the laws which have been made in pursuance thereof." 15 Stat. 711, 712 (1868). This presidential proclamation was the basis for a supporter of the Confederacy to seek reimbursement for "certain described personal property in West Virginia, which was seized and libelled by the authorities of the United States on the alleged grounds of his treason and rebellion" and "condemned and forfeited to the United States, and sold" pursuant to "a decree of the District Court for that district," and then "the net proceeds of the sale, amounting

14

to the sum of $11,000, were paid into the treasury of the United States." *Knote v. United States*, 95 U.S. 149, 149 (1877).[5] The Supreme Court rejected Knote's argument, determining that "if the proceeds have been paid into the treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress" because "[m]oneys once in the treasury can only be withdrawn by an appropriation by law." *Id.* at 154. Additionally, the Supreme Court held that "[h]owever large, therefore, may be the power of pardon possessed by the President, and however extended may be its application, there is this limit to it, as there is to all his powers,—it cannot touch moneys in the treasury of the United States, except expressly authorized by act of Congress." *Id.* The Court continued that "[w]here, however, property condemned, or its proceeds, have not thus vested, but remain under control of the Executive, or of officers subject to his orders, or are in the custody of the judicial tribunals, the property will be restored or its proceeds delivered to the original owner, upon his full pardon" because those "proceeds are not considered as so absolutely vesting in third parties or in the United States as to be unaffected by the pardon until they have passed out of the jurisdiction of the officer or tribunal." *Id.* Given that the funds derived from petitioner's confiscated property was already in the U.S. Treasury, his demand for post-pardon reimbursement was denied. *Id.* at 157.

In the century and a half since *Knote* was decided, the case has come, in part, to stand for the proposition that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in

---

[5]  The contemporaneous meaning of libelled also encompassed "[t]o proceed against, by filing a libel; to seize under admiralty process, at the commencement of a suit." *Libel*, Black's Law Dictionary at 713 (1st ed. 1891). The Second Confiscation Act, Ch. 195, 12 Stat. 589 (July 17, 1862), the statute under which Knote's property was seized, provided that "proceedings *in rem* shall be instituted in the name of the United States in any district court thereof, or in any territorial court, or in the United States district court for the District of Columbia, within which the property . . . may be found . . . which proceedings shall conform as nearly as may be to proceedings in admiralty or revenue cases," *id.* § 7, 12 Stat. at 591. Accordingly, the United States proceeded by libel.

the Treasury." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 425-26 (1990) (discussing *Knote*); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 469 (2024) (Alito, J., dissenting) (relying on *Knote* for the proposition that Congress's "appropriations authority[ is] an exclusively legislative prerogative"); *In re Madison Guar. Sav. & Loan (McDougal Fee Application)*, 353 F.3d 53, 55 (D.C. Cir. 2004) (per curiam) (discussing *Knote* in denying petitioner's application, after she was pardoned and her criminal convictions vacated, for reimbursement of attorneys' fees she had paid); *In re North*, 62 F.3d 1434, 1435 (D.C. Cir. 1994) (same).

Although Ochs' conviction was vacated but stayed following a successful collateral attack and his conduct only later insulated from subsequent prosecution by presidential pardon, this Court's Clerk's Office reports that the funds were deposited in the United States Treasury, and so they remain subject to the limitation created by the Appropriations Clause and articulated in *Knote*. For this reason, another Judge on this Court, Judge Royce C. Lamberth, when addressing a similar petition for reimbursement of court-ordered payments made for criminal restitution brought by a defendant convicted of offense conduct on January 6, 2021, reasoned that "it is irrelevant whether [defendant]'s convictions were vitiated by pardon, vacatur on appeal, collateral attack, retroactive Congressional enactment, or any other means." *United States v. Sullivan*, 783 F. Supp. 3d 385, 391 (D.D.C. 2025) (RCL). He continued, "[a]ll that matters is that funds may not be drawn from the Treasury without an appropriation, plain and simple." *Id.* (citing *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 94 (1992) (Rehnquist, C.J., concurring in the judgment) ("[T]he principle that once funds are deposited into the Treasury, they become public money—and thus may only be paid out pursuant to a statutory appropriation—would seem to transcend the facts of *Knote*.")). Three other Judges on this Court have reached the same conclusion, finding that "[t]he

Court's power to order a refund does not turn on whether a defendant's conviction was vacated or not; it turns on whether the defendant is *entitled* to funds that were deposited into the U.S. Treasury before the pardon was granted." *United States v. Vargas*, 789 F. Supp. 3d 60, 65 (D.D.C. 2025) (RDM) (emphasis in original); *see also United States v. Hager*, No. 21-cr-381 (TSC), 2025 WL 1886135, at *2 (D.D.C. July 3, 2025) (reasoning that *Knote* determined that "this court lacks the authority to order the Architect of the Capitol to refund Hager's $570"); *United States v. Sutton*, No. 21-cr-598 (PLF), 2025 WL 2149396, at *2 (D.D.C. July 15, 2025) (finding "that, absent congressional authorization to withdraw the funds, the Court cannot refund defendants' special assessments" paid into "the Crime Victims Fund—which is within the United States Treasury," while "the portion of Mr. Sutton's special assessment that currently is in the Court's Deposit Fund can be returned to him" because "the Court's Deposit Fund is an internal account within the judiciary, and monies held within the Deposit Fund have not yet vested in any third party").

Set against this longstanding authority that where a criminal defendant's payments of fees, fines and restitution have been deposited in the U.S. Treasury, *Knote* denies courts the authority to order the reimbursement those funds, Ochs' argument that *Nelson* provides such authority is considered.

B.    *Nelson v. Colorado* **Does Not Abrogate Settled Precedent**

Ochs relies on *Nelson v. Colorado*, 581 U.S. 128 (2017), to reason that "because there is no valid conviction in this matter, there is no authority for denying the return of restitution, fines, and special assessments Mr. Ochs previously paid." Def.'s Mot. at 4. In *Nelson*, two petitioners whose felony convictions were invalidated for procedural errors and ineffective assistance of counsel sought the return of funds paid for costs, fees, and restitution, but the Colorado Supreme Court rejected the request. 581 U.S. at 131. The state Supreme Court applied Colorado's Compensation for Certain Exonerated Persons Act, Colo. Rev. Stat. §§ 13-65-101, 13-65-102, 13-

17

65-103 (2016), which authorized the requested return of funds only "to a defendant who has served all or part of a term of incarceration pursuant to a felony conviction, and whose conviction has been overturned for reasons other than insufficiency of evidence or legal error unrelated to actual innocence," when that defendant "show[s], by clear and convincing evidence, her actual innocence of the offense of conviction." *Nelson*, 581 U.S. at 132-34. The Supreme Court reversed, holding that the statutory scheme did not comport with the Due Process Clause of the Fourteenth Amendment. *Id.* at 134. The Court reasoned that "Colorado may not retain funds taken from Nelson and Madden solely because of their now-invalidated convictions" because "Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary extractions." *Id.* at 136 (emphasis in original). Additionally, the Court found "a risk of erroneous deprivation" if defendants are "saddled with any proof burden" under the Exoneration Act because "they are entitled to be presumed innocent." *Id.* at 137. Thus, the Court concluded that, "[t]o comport with due process, a State may not impose anything more than minimal procedures on the refund of exactions dependent upon a conviction subsequently invalidated." *Id.* at 139.

Notably, nothing in the *Nelson* decision touches upon funds deposited in the United States Treasury nor implicates the Appropriation Clause, since the money at issue was collected by State authorities and the analysis focused on the appropriateness of State statutory regimes designed to provide refunds of restitution. For this reason, invocations of *Nelson* have been found entirely unpersuasive in evaluating motions for restitution brought by defendants convicted of their offense conduct at the U.S. Capitol on January 6, 2021. As Judge Lamberth concisely articulated the point: "*Nelson*, at bottom, is a case about the Due Process Clause of the Fourteenth Amendment and its supremacy over contradictory state law. At a high level of abstraction, it stands for the proposition that the several states may not erect procedural barriers that violate the federal Constitution's

18

guarantee of due process.  Accordingly, a state may not require a person whose presumption of innocence has been restored by the vacatur of his conviction(s) to *prove* his innocence in order to recoup his forfeited property."  *Sullivan*, 783 F. Supp. 3d at 390 (emphasis in original); *see also Vargas*, 789 F. Supp. 3d at 64-65 ("*Nelson* had nothing to do with the scope of the pardon power or the Appropriations Clause.  Rather, it held that vacatur of a conviction presumptively entitles a defendant to a refund of her payments into the state's coffers, and so 'a State may not impose anything more than minimal procedures' on obtaining that refund." (quoting *Nelson*, 581 U.S. at 139)).  This reasoning is persuasive.  Thus, *Nelson* falls far short of displacing the long-standing precedent in *Knote* to authorize the relief requested in Ochs' motion.

**C.      Ochs Provides No Alternative Authority for the Requested Relief**

Ochs relies exclusively upon *Nelson* for the relief requested, without identifying any other basis—statutory or otherwise—under which a refund could be properly ordered.  *See* Def.'s Mot. at 2-4.  Indeed, alternative possible statutory bases have been rejected as appropriate authority for reimbursement claims brought by similarly-situated defendants after they have been pardoned for their criminal convictions arising from their criminal conduct on January 6, 2021.

For example, in *Vargas*, the government—in contrast to its silence here—advanced the theory that 31 U.S.C. § 1322 "authorizes the return of" funds paid by a pardoned criminal defendant as part of restitution, fine and special assessment.  789 F. Supp. 3d at 65-66.  That statute provides, in relevant part, that "necessary amounts are appropriated to the Secretary of the Treasury to make payments from . . . the United States Government account 'Refunds of Moneys Erroneously Received and Covered' and other collections erroneously deposited that are not properly chargeable to another appropriation."  31 U.S.C. § 1322(b).  Judge Randolph D. Moss rightfully rejected this argument after determining that the disputed funds were not "collections erroneously deposited," explaining that "[b]ecause [defendant]'s payments were collected while

his convictions were 'in force,' the funds were not 'erroneously collected' and are therefore not refundable from this account." *Vargas*, 789 F. Supp. 3d at 66 (quoting *Knote*, 95 U.S. at 154).

Another rejected statutory basis for such refunds is The Judgment Fund Act, 31 U.S.C. § 1304(a), which provides, in relevant part, that "[n]ecessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when" certain conditions are met. As Judge Lamberth determined, § 1304(a) does not represent viable authority to return funds to defendants whose convictions were vacated because, "[t]hough he may have been pardoned, and his convictions may have been vacated, he has not been awarded anything resembling a 'final judgment[ ] . . . against the United States.'" *Sullivan,* 783 F. Supp. 3d at 394 (first alteration added). Rather, "the vacatur of a judgment *against* a criminal defendant is an act of erasure that is not tantamount to a judgment *for* that defendant against the United States." *Id.* (emphases in original) (citing *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 15 (2023) (Jackson, J., concurring in the judgment) ("Vacatur is a remedy that erases a judgment that has already been rendered.")). This Court agrees that a vacatur does not represent a final judgment against the United States "[e]ven under the most generous construal of these statutory provisions," *id.*, and therefore a prerequisite for invoking the authority of § 1304(a) is not met.

The rejection of The Judgment Fund Act as a basis for reimbursement of funds to a newly pardoned, former-convicted-felon defendant is not unanimous on this Court. Ochs, however, does not cite or rely on either of two decisions, including one released just two days before his motion was filed, holding that § 1304(a) of The Judgment Fund Act serves as a viable basis to return funds paid by defendants whose appeal was pending at the time a pardon was issued, a different procedural posture than that presented by the instant matter. *See United States v. Ballenger*, 811

20

F. Supp. 3d 123, 130 (D.D.C. 2025) (JEB) ("But because *this* pardon arrived while Defendants'

appeal was pending and thereby mooted their appeal, it caused their convictions to be vacated."

(emphasis in original)); *United States v. St Cyr*, 804 F. Supp. 3d 1, 5 (D.D.C. 2025) (JDB) ("But

while that appeal was pending, Trump was inaugurated for his second term as President, and he

immediately issued a blanket pardon for all those convicted of offenses related to the events of

January 6."). Both decisions found that *Nelson* "drew on principles of . . . vacatur" to determine

"that the petitioners had an interest in the money they had paid to the state," *St Cyr*, 804 F. Supp.

3d at 9, and then, comparing the position of a defendant whose conviction is vacated while on

appeal to the position of the estate of a defendant seeking to invoke the doctrine of abatement *ab

initio*, further found that "every court of appeals to have addressed the issue post-*Nelson* has held

that, when a federal conviction is vacated on appeal due to the defendant's death, the defendant's

estate has a right to the money the defendant paid to the government pursuant to his conviction,"

*id.* at 9 & n.8 (citing out-of-circuit cases); *see also Ballenger*, 811 F. Supp. 3d at 128-29 (citing

overlapping set of out-of-circuit cases).[6] Analogizing the two situations, "in both cases, the

---

[6]    Notably, none of the out-of-circuit cases cited in *St Cyr* and *Ballenger* stand for the proposition that in applying the doctrine of abatement *ab initio*, court-imposed restitution must be returned to a defendant after transfer to the victim. *See United States v. Reynolds*, 98 F.4th 62, 72 (1st Cir. 2024) ("[W]e do not take any position on whether the different considerations that might arise where forfeited property had been distributed to victims before a defendant's death would call for a different result, as no suggestion has been made here that any forfeited funds were distributed to victims before Reynolds died."); *United States v. Brooks*, 872 F.3d 78, 89-90 (2d Cir. 2017) (holding that "when a criminal conviction abates upon the death of a defendant, any restitution ordered as a result of that conviction must also abate" but noting that "[t]he district court stayed the payment of Brooks's restitution while this case was on appeal," so whether restitution already paid is "irretrievable" need not be decided); *United States v. Libous*, 858 F.3d 64, 67 (2d Cir. 2017) (reasoning that "[t]here is no legal basis on which the state can retain a fine exacted from Libous as punishment for an offense he is now presumed not to have committed" but not discussing restitution as no restitution had not been ordered); *United States v. Ajrawat*, 738 F. App'x 136, 137, 140 (4th Cir. 2018) (per curiam) (unpublished, per curiam order applying, upon the death of the defendant-appellant, doctrine of abatement "to vacate the orders of restitution and forfeiture and the special assessment" and "order[ing] repayment of any other monies paid as a consequence of these convictions," but not addressing return by victim of any restitution, which likely had not been paid, since defendant had only paid "portion of special assessment"); *United States v. Est. of Parsons*, 367 F.3d 409, 417-18 (5th Cir. 2004) (en banc) ("Although, as explained, we conclude that restitution orders against Parsons should abate with his death, neither the agreement nor the Preliminary Judgment of Forfeiture requires the government to return the already-paid funds."); *United States v. Volpendesto*, 755 F.3d 448, 454 (7th Cir. 2014) (finding that "[w]ithout a final criminal conviction, there can be no order of restitution," but never considering whether paid funds must be returned); *United States v. Rich*, 603 F.3d 722, 728 (9th Cir. 2010) (determining that

21

defendants were convicted and appealed; then an event that had nothing to do with the conviction's merits—there, an ill-timed death; here, a luckily timed pardon—rendered the appeal moot[, so] [i]f those deceased defendants are entitled to refunds, these pardoned defendants must be, too." *Ballenger*, 811 F. Supp. 3d at 129. Any comparison to abatement *ab initio* is inapposite here because Ochs, who waived all direct appeal rights as part of his plea agreement, had no appeal pending at the time his conviction was vacated (with vacatur order stayed) and he received a pardon. *See United States v. Pogue*, 19 F.3d 663, 666 (D.C. Cir. 1994) ("The abatement rule applies when a direct appeal is *pending* at the time of appellant's death." (emphasis in original)).

Accordingly, neither 31 U.S.C. § 1322 or The Judgment Fund Act, 31 U.S.C. § 1304(a), provide a federal statutory basis for an order to return to Ochs any funds already deposited in the U.S. Treasury.

## III.   CONCLUSION

Ochs fails to marshal either a constitutional or statutory basis that would permit this Court to disburse funds from the United States Treasury to pay him the reimbursement he seeks. Accordingly, his motion for return of restitution, criminal fines, and fees is **DENIED**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  April 28, 2026

_____
**BERYL A. HOWELL**
United States District Judge

---

"[a]batement of the convictions for those offenses, thus, nullifies the accompanying restitution order" but not ordering return of paid restitution); *United States v. Coddington*, 802 F. App'x 373, 373 (10th Cir. 2020) ("remand[ing] to the district court with instructions to vacate the judgment, including the convictions and restitution order," but not expressly contemplating ordering return of restitution funds).

22